JAMES IRWIN, APPELLANT, *v.* THE UNITED STATES.

On 6th November, 1836, W. F. Hamilton, William V. Robinson, and wife, by deed, conveyed to the United States " the right and privilege to use, divert, and carry away from the fountain spring, by which the woollen factory of the said Hamilton & Robinson is now supplied, so much water as will pass through a pipe or tube of equal diameter with one that shall convey the water from the said spring, upon the same level therewith, to the factory of the said grantors, and to proceed from a common cistern or head to be erected by the said United States, and to convey and conduct the same, by tubes or pipes, through the premises of the said grantors in a direct line, &c. &c.

The distance to which the United States wished to carry their share of the water being much greater than that of the other party, it was necessary, according to the principles of hydraulics, to lay down pipes of a larger bore than those of the other party, in order to obtain one half of the water.

The grantors were present when the pipes were laid down in this way, and made no objection. It will not do for an assignee, whose deed recognizes the title of the United States to one half of the water, now to disturb the arrangement.

Under the circumstances, the construction to be given to the deed is, that the United States purchased a right to one half of the water, and had a right to lay down such pipes as were necessary to secure that object.

THIS was an appeal from the Circuit Court of the United States for the Western District of Pennsylvania, sitting as a court of equity.

The facts were these:

On 6th November, 1836, W. F. Hamilton, William V. Robinson, and wife, by deed, conveyed to the United States " the right and privilege to use, divert, and carry away from the fountain spring by which the woollen factory of the said Hamilton & Robinson is now supplied, so much water as will pass through

a pipe or tube of equal diameter with one that shall convey the water from the said spring, upon the same level therewith, to the factory of the said grantors, and to proceed from a common cistern or head to be erected by the said United States, and to convey and conduct the same, by tubes or pipes, through the premises of the said grantors in a direct line, or as nearly as practicable thereto; and the privilege of entering upon the premises of the said grantors for laying, and when necessary altering, the said pipes, or repairing them; also the privilege of erecting and repairing the said cistern or reservoir, or other erection as may be deemed necessary for preserving the said water for the use aforesaid, and all other rights and privileges in common with said grantors, their heirs and assigns."

The United States proceeded to lay down the pipes in the manner described in the following testimony, which was given by Mr. Bates.

Giles S. Bates being produced on part of complainant, and sworn, says: I was employed at the United States arsenal, at Lawrenceville, Alleghany county, Pennsylvania, for about sixteen years; I ceased to be employed there about the last of June, 1852. I know the spring from which the arsenal is supplied with water, on the land of Samuel H. Kellar; it is the same spring from which Mr. James Irwin's factory is supplied; the distance from the spring to the reservoir of the arsenal is five hundred and forty-seven yards or thereabouts; the ground is somewhat broken or uneven. There are three ravines; the first ravine, from summit to summit, is about two hundred feet wide, and from twenty-five to thirty feet deep; the second is about one hundred feet wide and about fifteen feet deep; the third is about fifty feet wide and from eight to ten feet deep, that is the width and depth at the point where the United States pipes pass; the pipes follow the inequalities of the ground; they are about three feet below the surface of the ground, from that to four feet; the pipe from the spring to the reservoir is two-and-a-half bore pipe; the copper pipe connecting the iron pipe with the cistern is two inches and five eighths, and about one foot long; the hole through the body of the cistern is one inch in diameter; the copper pipe is bolted to the cistern by a flange; the hole through which the water passes to supply Mr. Irwin's works is the same size as the one through which it passes to supply the arsenal, and the two holes are on the same level. I was in the employment of the United States when the pipes referred to for the supply of the arsenal were laid; I was present most of the time while they were laying them; they are the same pipes which are now in use; they have been in use since 1837. I saw Mr. William V. Robinson present on two occasions

when the pipes were being laid; he was present with Colonel Baker; I heard him express no dissatisfaction; they appeared to have a perfect understanding in the arrangement, and that arrangement is the one now in use. I was and am still under the impression that the copper pipe was an inch one originally, but I am not positive; with that exception the arrangement is now as it was then. I do not know of any change in the size of the pipe since; some pipes were put down to secure the air-valve, but no alteration in the size of the pipe; any deposits in the pipes collect in the ravines, and when the air gets into the pipes from the cistern it has to be drawn out at these air-valves in order to fill the pipes; the amount of water discharged at the reservoir would fill a three-quarter inch pipe. I have had partial charge for some time of the work; have been frequently at the spring; assisted to clear the pipes of air and to fill them. The ground where the United States pipe crosses from the ground of Mr. Irwin is about fifteen feet higher than where the pipe discharges its contents at Mr. Irwin's factory; the ground through which the pipe passes from the spring to Mr. Irwin's factory is a regular slope. The distance from the spring to where the United States pipe passes from Mr. Irwin's land is greater than from the spring to Mr. Irwin's factory; it is hardly one third of the distance to the reservoir; the body or rim of the cistern through which the inch hole passes, is about seven eighths thick.

*Question.* When the United States arsenal and Mr. Irwin's factory are both in operation, what is the relative amount of water drawn off by the pipes of each?

I believe the amount to be about equal.

*Cross examined.* I do not know that the ravines spoken of would make any difference in the flow of the water, provided there was a sufficient head at the spring to exclude the air from the pipe; if air was admitted into the pipe, I am of opinion that the water would still continue to flow, but to a limited extent.

We can see the water flowing from the United States pipe into the reservoir. When the reservoir was first established, the pipe discharged about four feet from the bottom of the reservoir; and I have frequently seen the water discharging into the reservoir from the pipe. That mode of discharging was discontinued between seven and eight years ago. It discharged through a brass cock, two-inch bore. The United States used the water for ornamental purposes on the parade at intervals for a number of years, when the supply of water would permit. The centres of the holes in the cistern from which the water is taken to the reservoir and to Mr. Irwin's factory, are on the same level, and the centres of the pipes are on the same level, but the difference

in the diameter of the pipes throws the United States pipe about three fourths of an inch below Mr. Irwin's pipe. The diameter of Mr. Irwin's pipe is an inch bore, I should judge.

*Direct.* I think the deposit of sediment in the pipe in the ravines would obstruct the water, unless there was a sufficient draft in the pipe to draw it out. I know that sediment has collected in the pipe in the bottom of the large ravine. The sediment was a kind of sand, oxide of iron, and of a muddy nature.

*Cross examined.* I only know of sediment having collected in the pipe once so as to require opening during the time I was at the arsenal. The air-valves spoken of were constructed to insure a continuous flow of water, and in order to draw off the foul air and allow the water to flow; and they answered the purpose of their construction. The discharge of the water into the reservoir from the two-inch cock is from a half to three quarters of an inch. If the pipe used by the United States had been of lead instead of iron, the obstruction from sediment would probably not have been as great. There is quite a sediment comes from the water of this spring. We used it in our boilers at the public works, and found it quite objectionable from the accumulation of sediment — of fine sand. We have been compelled to clean out the reservoir from sediment, but I cannot say whether it has been necessary to clean out the cistern at the spring or not.

*Direct.* — The flow of water mentioned as coming from the brass cock at the reservoir was the entire supply received from the spring.                               G. S. BATES.

On the 13th of January, 1842, Robinson and Hamilton conveyed their interest to James Caldwell, whose interest was conveyed by the sheriff to William Black, in December, 1843.

On the 30th of January, 1848, Black conveyed to Irwin (the appellant) by deed, reciting all the mesne conveyances, and among them the deed from William F. Hamilton and William V Robinson and wife, " to the United States of America, for privilege of one half the spring, &c., dated 26th November, A. D. 1836, and recorded in Book C, 3d p. 480."

On the 16th of January, 1852, the said James Irwin (now appellant) gave the notice to Major Bell, of the Alleghany arsenal, alleging that the government have in use a pipe to convey the water from the spring to the arsenal, " which is over four times the capacity of that contracted for." . . . " That unless some satisfactory proposition be made by the government within thirty days, I will cut off the pipe referred to."

Instead of a proposition to purchase, the United States exhibited their bill, and obtained an injunction.

The bill sets forth the agreement, &c.

And claims that after the parties have respectively drawn off their several shares, by holes or tubes inserted in said vessel, of equal diameter and on the same level, they may then carry away the water by a pipe or pipes of such size and diameter as they may respectively think proper to adopt.

It-further charges that the defendant, at the time of his purchase, knew the extent of the complainants' right, under their said deed, and was well aware that it conferred on them a right to one half of the water of the said spring.

The answer admits the agreement, and asserts that although the complainants were permitted by the said Hamilton & Robinson to lay down their pipes of a dimension far exceeding those which had been at any time used to convey the said water to their factory, the same was permitted because the said grantors were not carrying on business at the said factory, or using the said water for the purposes thereof, and with the understanding that the license thus temporarily accorded should not be taken to operate in any way to the enlargement of the rights of the complainants, or to the prejudice of those of the grantors; that the defendant was not advised, at the time of his purchase, of the dimensions of the complainants' pipes, or that they were exceeding their rights, and had no means of ascertaining the same, but was induced to suppose, from the dimensions of the vent or orifice, that the pipes which were concealed from view were entirely correspondent therewith:

And further, that the recital in defendant's deed is not to be taken either as 'an interpretation of the original grant, or the admission of a right, on the part of complainants, to one half of the water, or as operating, or intended to operate, as an enlargement of the grant, because no part of the said water was used by the party under whom he claims, and the said conveyance is set forth merely as a part of the chain of title, and with express reference to the deed itself, and the record thereof, for the details, both of which manifestly show that the same was a misdescription or a mistake of the scrivener in the recital thereof, and no way affecting the conveyance to the defendant, which is of the whole interest of the grantor:

And further, that although his immediate grantor may have labored under such an impression, neither he nor the defendant, who is his assignee, is to be concluded or affected by any mistake in regard to his rights in a conveyance to which the complainants were neither parties or privies.

The answer further admits that the complainants did enter and construct a common vessel or reservoir, as alleged — that the same was pierced with two circular holes, of equal diameter

and elevation, for the use of the respective parties, and that the complainants did proceed to lay through the premises of the grantors a pipe for the conveyance of the water from one of the said holes or orifices.

It denies, however, that the said cistern was pierced at any time with any tubes whatever, or that complainants laid down, through the premises of the grantors, any pipes or tubes of a dimension corresponding with either of the said holes or orifices, or of equal diameter with the tubes or pipes which were used for supplying the works or factory of the grantors; but avers to the contrary, that although the pipe or tube which was then used and continued to be used, for the purpose of supplying the factory of the grantors, has at no time exceeded the diameter of one inch, and has conformed precisely to the position and level of one of the said holes or orifices, the said complainants have laid down and are now using, through the premises of the defendant, a tube of the diameter of two and a half inches, with a capacity more than six times that of the tube used by the defendant, and not conforming in its level or elevation with either of the orifices aforesaid, but affixed to the exterior circumference or rim of the said cistern in such manner as to extend below the said orifice, and to increase the weight or head of water about seven eighths of an inch over and above that of the defendant.

The above are the material facts of the answer.

To this answer a general replication was filed, and the cause sent to an examiner; and on the 19th of November, 1852, the cause came on to be heard on bill, answer, exhibits, replication, and testimony, and was argued by counsel, and upon consideration thereof, the court awarded a perpetual injunction against the defendant, as prayed, with costs.

Whereupon the defendant entered this appeal from the said decree.

It was argued by *Mr. Wylie* and *Mr. Ritchie,* upon a brief prepared by *Mr. Irwin,* for the appellant, and by *Mr. Cushing,* (Attorney-General,) for the United States.

The following extracts from the brief filed by the counsel for the appellant, will show their views;

The learned judge who decided the case below was of opinion that the words of the deed imported a conveyance of one half of the water.

It is most certain, however — and so much is admitted by the learned judge himself — that there is nothing in the terms of the deed, or, to use his own language, "in so many words," to convey such an interest.

It is not less certain that if such was the intent of the parties, it might have been precisely indicated by the obvious, easy, and familiar form of expression which the occasion would naturally and almost necessarily have suggested.

. And the presumption is, that it would have been so indicated, instead of either resorting to a standard which was erroneous, or clouding the meaning with a periphrasis.

It is a part of the case, however, that a tube or pipe leading to the arsenal of the complainants, of equal diameter with that used to convey the water to the factory of the grantors, will not deliver more than a fractional part of the water conveyed by the latter; and that this is the result of a law of hydraulics which every man, and certainly every agent of the government, is bound to know.

It is also to be taken as a part of the case that the localities of the several properties, and the distance to which the water was to be conveyed or at all events to the premises of the grantee, were well understood by the parties, and of course a plea of ignorance of the facts would be as unavailable to the complainants, as the more discreditable plea of ignorance of a natural law.

It is incontrovertible, therefore, that if only a fractional part of the water delivered to the grantors could be conveyed by the means agreed on, to the premises of the grantees, then it was just that portion, and no more, that was intended to be conveyed to the complainants.

Nor is it any answer to say that the grant would be rendered illusory, and the object of the grantee defeated thereby. There is nothing in the deed to indicate either the quantity of water required, or the purpose for which it was destined, and although it might be convenient or even necessary for the government to enlarge the supply, this court can make no new contract for the parties by the substitution of terms which they have not thought proper to use. There is no ambiguity in the language, and in such case it is a maxim of the law that no construction can be made against the words. And yet it is by such a process of change and substitution that it is now sought to escape from the consequences of what is considered a hard bargain for the government.

The effect moreover of the departure on the part of the complainants, from the terms of the contract, and the simple and easy rule which it prescribes, is to produce irregularity in the flow, and to render every thing uncertain. No witness, examined by the government, has undertaken to speak with any degree of precision in regard to the comparative quantities of water drawn through the two pipes. They suppose them to be

" near about equal," but they admit that " the flow of water through the complainants' pipe is much greater at some times than at others, and that this does occur frequently ; " and that " at times the complainants' pipe draws more water than that of the defendant, and at times it loses, so that the quantity drawn by both pipes is near about equal."

The facts of irregularity and occasional advantage are thus admitted, in connection with the liability to abuse, and the impossibility of precise measurement, and of course of detection or correction — an objection which led the Supreme Court of Pennsylvania to hold, in the case cited from Wharton, that a circular aperture could not be substituted for a square.

It-is sufficient, however, for our case — even though the court were right in their construction of the deed — that the arrangement was such as to deprive us of our share of the water at any time. We are entitled to it at all times. We are not to be put off with a mere average — a principle which would authorize the government to take the whole of the water for one half the year, provided it allowed us the whole for the other.

But there is another violation of the contract — supposing even the construction of the court to be the correct one — in the position of the copper adjutage, as well as in the level and inclination of the distributing pipes. The deed provides that the complainants' pipe shall be upon the same level with that which shall convey the water to the factory of the grantors. The copper adjutage is however seven eighths of an inch below, while the point of discharge is lower by at least sixty — perhaps one hundred feet — thus conferring the twofold advantage of a greater head and a more rapid chute.

Supposing however that the water was, by the terms of the contract, to be gauged by equal orifices, it has been settled, as already shown, by the Supreme Court of Pennsylvania, in the case of the Schuylkill Navigation Company *v*. Moore, that no artificial contrivance can be resorted to, for the purpose of increasing the volume of discharge at the point of delivery.

It remains, then, only to consider the supplementary reasons by which it is sought to supply any possible insufficiency in the terms of the contract. They are

1st. The construction supposed to have been given to it by the parties themselves, as shown by the assertion of a larger right in the laying of the present pipes with the knowledge and without any objection on the part of one of the grantors; and

2d. The recital in the deed of William Black to the defendant.

I pass over the suggestion in regard to the rule that the " words are to be taken most strongly against the grantor," which is

hinted at as a possible though unnecessary resort in the present case. That rule, which is one of great rigor, applies only to cases of ambiguity in the words, or where the exposition is necessary to give them effect, and is only to be resorted to when all other rules of exposition fail. 2 Kent's Com. 556. And it is now superseded by the more reasonable practice of giving to the language its just sense, and searching for its precise meaning. Ibid.

To the argument, however, drawn from the fact that the present pipes were laid without objection, I reply

1st. That there is no ambiguity which would authorize an appeal to the acts of the parties themselves for the purpose of giving a construction to their contract. In the case even of a patent ambiguity the deed must speak for itself. It is not pretended that there is any which is latent, and which parol evidence might therefore raise and remove.

2d. That the evidence shows that the factory never went into operation after the purchase by the United States, and no inference is therefore to be drawn to the prejudice of the defendant from the acquiescence of the grantors. If such inference might thus be drawn, then by the same process the rights of the grantors might be taken as altogether abdicated by mere non-user, and a mere temporary parol license without consideration, be regarded as an absolute conveyance of the entire fee.

3d. That the right, being an incorporeal one, could only pass by grant or prescription, which presupposes it. Callen *v*. Hocker. 1 Rawle, 108.

4th. That the evidence shows further that the copper pipe was a one-inch bore originally; while, on the other hand, there is no evidence that either the grantors or their assigns were ever advised of the change.

Then as to the recital in the deed, the answer is,

1st. That the conveyance is of the whole interest held by Black, which was the entire estate of the original grantors; and the recital is not even a description of the property intended to be conveyed, but a mere enumeration of sundry deeds with a reference, for their contents, to the records themselves, which exhibit a clear case of mistake.

2d. That if the said Black was even mistaken as to the extent of his right, it was entirely "*res inter alias acta*," and cannot either compromise that right or enlarge the terms of a grant made to a third person, between whom and the immediate grantor of the defendant there was no priority whatever. And

3d. That the inference that the defendant knew that he was buying only one half of the water right, is entirely gratuitous, neither warranted by any evidence in the cause nor by any just

44 *

view of the law. The conveyance was of the whole estate of the grantors, &c.; and there is no lawyer who would not have advised him that it would pass, notwithstanding a mistake in his references or a misdescription of any of his deeds.

*Mr. Cushing,* (Attorney-General,) contended that, the title deed to the United States shows they are entitled to the use of one half of the water; the title paper of the appellant, Irwin, shows the same; the proof shows that the pipes of the United States and of the appellant convey an equal quantity of water, and that the threat of the appellant to cut away the pipe was without any just cause, designed, as the bill charges, to compel the United States to purchase of the said Irwin the residue of the water at an exorbitant price.

Mr. Justice GRIER delivered the opinion of the court.

The appellant, James Irwin, was respondent below to a bill filed by the United States, in the nature of a bill "*quia timet,*" in which Irwin was charged with threatening to cut off certain pipes conveying water to the United States Arsenal, near Pittsburg. The whole merits of the case are involved in the construction to be put on a certain deed under which the United States claimed to have a right to "one half of the water" delivered from a certain spring or reservoir. The parties both claim under William F. Hamilton and W. V. Robinson, who conveyed to the United States "the right and privilege to use, divert, and carry away from the fountain spring, &c., by which the woollen factory of grantors is now supplied, so much water as will pass through a pipe or tube of equal diameter, with one that shall convey the water from the said spring, upon the same level therewith to the factory of said grantors, and to proceed from a common cistern or head to be erected by the said United States, and to convey and conduct the same through the premises of the said grantors, &c."

This grant to the United States was made in November, 1836, for the consideration of $2,500. Without stating, in so many words, that the water from the common cistern is to be divided equally, or each to have one half, this deed points out a mode of equal distribution at the cistern. The water is to be delivered to each by a pipe or tube of equal diameter at the same level. The mode of conducting it by either party to the place of its use is not prescribed. Each might have had his share delivered into a tank or cistern of his own placed along side of the common cistern, which would have been probably the best plan. The United States were permitted to conduct their share of the water through the lands of the grantors " by

tubes or pipes" without any restriction as to the size of them. The distance from the common cistern to the arsenal of the United States, where their share of the water was to be conducted, is four times as great as that to the grantors' premises.    Owing to friction, and other causes, explained by the witnesses, it was proved that the flow of water in equal tubes is in the inverse ratio of the squares of the distances.    Hence an orifice or tube capable of receiving and passing equal quantities at the fountain-head, if continued of the same size to the place of delivery, would have distributed to the United States about one sixteenth and to the vendors fifteen sixteenths.    In fact, from the unevenness of the ground over which the water must necessarily flow to the arsenal, and the quantity of deposit made in its course, such a construction of the contract would leave the United States very frequently, if not always, without any water at all.

The grantors in the deed had no intention of overreaching the grantees, by taking advantage of their want of knowledge of the science of hydraulics, or claiming a construction of their deed which would give their grantees nothing, and thus allow the grantors to again extort from the necessities of the government a double price.

Robinson, one of the grantors, was examined by the appellant as a witness, and swore that one half the water was sold, and one half reserved, " that such was the agreement." This was the practical (and only reasonable) construction put on the grant by both parties at the time it was made ; and, accordingly the officers of the United States proceeded to make a common cistern, and to ascertain the size of two tubes sufficient to convey the whole water held in common, and distribute it equally — leaving the vendors to convey their share in pipes of any size they saw fit, they used pipes to convey the water to the arsenal of such size as was deemed necessary from the distance and nature of the ground.    The vendors looked on, assisted and acquiesced in all that was done.    If the deed were ambiguous, and capable of a construction, which would permit one party to overreach and defraud the other; if there were no such rule of law as that which gives a construction to a deed most favorable to the grantee ; yet we have here a practical construction by the vendor and vendee made on the ground, and acquiesced in for sixteen years.    The appellant's deed from an assignee of the original vendors, carefully refers to this sale to the United States, as a sale " of one half of the water."    We are of opinion, therefore, that a reasonable construction of the deed to the United States, having reference to the principles of hydraulics, necessarily requires that each party should have half the water, and conduct it in such pipes as they see fit and proper : and

also, that assuming the deed to be capable of the construction contended for, the parties to it have construed it honestly and correctly; and that this practical construction having been acquiesced in by all parties interested for sixteen years, is conclusive. The appellant, whose deed purports to convey to him but one half the water, cannot now claim to put a new construction on the grant to the appellees which would give them nothing for the large consideration paid, and the appellant all for nothing. However plausible and astute the reasoning may be, on which such a claim is founded, it does not recommend itself on the ground of justice or equity.

The judgment of the Circuit Court is therefore affirmed, with costs.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Western District of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court, in this cause, be, and the same is hereby affirmed.