MONETT ELECTRIC LIGHT, POWER & ICE CO. v. INCORPORATED
CITY OF MONETT, MO., et al.

*(Circuit Court, Judicial District, Missouri, at Joplin, S. W. D. January 9,
1911.)*

No. 134.

1. MUNICIPAL CORPORATIONS (§ 285*)—"CONTRACT"—GRANT OF EXCLUSIVE
FRANCHISE.
    Under Rev. St. Mo. 1889, § 1589, authorizing cities of the fourth class
    to grant an exclusive franchise to furnish electric light to the city and
    its inhabitants for a term not exceeding 20 years, an ordinance granting
    such right, duly passed, signed by the mayor and accepted by the gran-
    tee, constitutes a contract binding on the city.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
    757; Dec. Dig. § 285.*
    For other definitions, see Words and Phrases, vol. 2, pp. 1513–1534;⁣
    vol. 8, pp. 7615, 7616.]

2. CONSTITUTIONAL LAW (§ 128*)—"IMPAIRMENT OF OBLIGATION OF CON-
TRACT"—GRANT OF EXCLUSIVE FRANCHISE BY CITY.
    Where a city has granted an exclusive franchise to an electric light
    company to furnish lights to the city and its inhabitants for a term of
    years, under legislative authority, and the grant has been accepted and
    acted on, it is an impairment of the obligation of the contract so made
    within the constitutional meaning of the term for the city to enter into
    competition with the company before the expiration of the grant.
    [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§
    372–389; Dec. Dig. § 128.*
    For other definitions, see Words and Phrases, vol. 4, pp. 3412–3417.]

3. MUNICIPAL CORPORATIONS (§ 122*)—PRESUMPTIONS—VALIDITY OF ORDI-
NANCES DULY SIGNED.
    A city ordinance duly signed by the mayor was presumptively regu-
    larly passed and presented to him for his approval.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
    284–286; Dec. Dig. § 122.*]

4. EVIDENCE (§ 186*)—SECONDARY EVIDENCE—COPY OF CITY ORDINANCE.
    Where a city ordinance has been lost, a copy made and compared by
    the clerk and certified by him with the corporate seal of the city at-
    tached is admissible as secondary evidence.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 661–673; Dec.
    Dig. § 186.*]

5. MUNICIPAL CORPORATIONS (§ 106*)—ENACTMENT OF ORDINANCES—STATU-
TORY REQUIREMENTS—RECORDING OF VOTE.
    Rev. St. Mo. 1889, § 1597, applying specially to cities of the fourth
    class, provides that "no ordinance shall be passed except by bill, and no
    bill shall become an ordinance unless on its final passage a majority
    of the members elect shall vote therefor and the yeas and nays entered
    on the journal," and such provisions as construed by the Supreme Court
    of the state are mandatory, and a compliance therewith is essential to
    the validity of an ordinance. At a meeting of the council of a city
    having six aldermen, the record showed the presence at roll call of four,
    who were named. The journal further recited that a bill was "pre-
    sented * * * and upon motion adopted. Yeas five, nays none."
    *Held*, that such record did not, either literally or substantially, comply
    with the statute, since it failed to show the vote of any particular one
    of the six aldermen elect, and that the ordinance was void.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
    221–228; Dec. Dig. § 106.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. MUNICIPAL CORPORATIONS (§ 341\*)—ILLEGAL CONTRACT—EFFECT OF PART PERFORMANCE.**

A city having power to grant an exclusive franchise to an electric light company for a term of years undertook to do so by an ordinance which was void because not passed in conformity to law. The grantee accepted the ordinance, built a plant, and furnished light and power to the city and its inhabitants for the greater part of the term, receiving payment therefor. *Held*, that the fact that the contract had been performed for such length of time did not render it valid nor give the company the right to enforce it in equity for the remainder of the term.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 341.\*]

In Equity. Suit by the Monett Electric Light, Power & Ice Company against the Incorporated City of Monett, Mo., Perry Short, as Mayor, Leroy Jeffries, J. F. Moses, John Walsh, W. J. Mills, R. C. Farrow, G. N. Patterson, G. P. Gammon, and C. W. Vaugn, as the Board of Aldermen, and D. S. Breese, as Clerk of said City, W. K. Martin, and L. G. Knapp. Decree for defendants.

Joseph M. Hill, James Brizzolara, and H. L. Fitzhugh, for complainant.

Thomas D. Steele and Fielding P. Sizer, for defendants.

VAN VALKENBURGH, District Judge. This is a suit in equity to restrain the city of Monett, Mo., and its officers from building and operating a municipal light plant in said city. The facts as disclosed by the proofs are as follows:

On the 4th day of February, 1893, the city of Monett, being then a city of the fourth class, acting under authority of the statutes of the state of Missouri pertaining to cities of that class, undertook to grant to one H. Ward Hicks, his successors or assigns, the exclusive right and privilege to erect, construct, operate, furnish, and maintain electric light works and an electric power plant to furnish electric lights and electric power for the use of said city and its inhabitants for a period of 20 years. This was by ordinance numbered 107. Pursuant to law, this action of the city council was made subject to ratification by the qualified voters of the city voting at a special election to be called for the purpose and to be held February 16, 1893. On the same day the council essayed to pass an ordinance calling a special election to submit this proposition to the voters, which ordinance was numbered 108, and thereunder the notice provided was duly given, and the special election held. February 18th the the common council undertook to pass an ordinance numbered 110, declaring the result of the special election held on the 16th day of February, 1893, as aforesaid, in which it was recited that 326 votes were there cast; 267 being in favor of the franchise and 59 against it. By Ordinance No. 110 it was further declared that H. Ward Hicks, his successors or assigns, had received the grant of said franchise under Ordinance No. 108, and was empowered, authorized, and entitled to the exercise of all the rights and privileges subject to the limitations and duties set forth and embodied in said grant or franchise. Thereupon, to wit,

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

on the 28th day of February following, said Hicks filed with the city his formal acceptance of the franchise thus granted, and subsequently assigned it to the complainant herein. A lighting and power plant was constructed, and service to the city and its inhabitants began in due course. As heretofore stated, the ordinance sought to vest in the grantee the exclusive right to furnish electric light for the use of the city and its inhabitants for a period of 20 years in accordance with the power conferred upon cities of the fourth class by section 1589 of the, Revised Statutes of Missouri of 1889. The complainant continued to enjoy its exclusive franchise for some years thereafter, but lately disagreements arose between it and the city. Complaints were made of the character and sufficiency of the service, with the result that numbers of the citizens withdrew their patronage, and provided themselves with lights from other sources, not, however, in conflict with the franchise here in controversy. In February, 1909, the company desired to repair its plant and extend its service lines, and for that purpose contemplated a new location for many of the poles carrying its wires, and in this connection a conflict arose between the company and the city over the points at which the company would be permitted to locate its poles, the company desiring to transfer portions of its system from streets then occupied to certain alleys and the city seeking to restrict the locations to the points formerly occupied; it being apparent from the testimony that the city contemplated the use of these alleys and perhaps other points sought to be appropriated by the company for its proposed improvements and extension for use in the erection of a municipal lighting plant. The outcome of this controversy was that the company attempted to make locations of its poles without authority as contended by the city, and the city stopped such work on the part of the company and caused the poles to be removed; the city resorting to arrests of the officers and employés of the light company in the enforcement of its claims, and the company appealing to the courts to enjoin the city and its officers from such alleged unlawful interference. It clearly appears from the testimony that the plant at that time had been in operation for about its natural life, and it had become necessary, in the opinion of the company, to rebuild the entire system. Naturally the conflict between the company and the city respecting the extension and location of the light mains resulted in the abandonment of any attempt at improvement of the plant, so that in the spring of 1909 we find a greatly impaired and worn out lighting system, inadequate to meet the demands of the city under normal conditions, the city and its people dissatisfied and unwilling to grant further extension and changes of locations which might tend to embarrass the city in the establishment of its own plant either presently or at the end of the twenty-year franchise, and both parties in such an attitude of antagonism and hostility as to preclude any probable adjustment of the difficulties or the furnishing of satisfactory lighting service. At that time the franchise had less than four years to run. The physical property of the company was badly out of repair, and the entire plant could be rehabilitated only by the expenditure of large sums of money apparently essential to its practical re-

building. In no event could the existing franchise endure longer than 1913. No renewal was provided by its terms, nor would such a provision have been binding if made; and exclusive franchises for cities of the fourth class are now no longer authorized by the law of this state.

In this extremely unsatisfactory situation, the mayor and common council of the defendant city in June, 1909, passed an ordinance by which it was provided that said city should erect an electric light system, and should itself furnish the city and its inhabitants with electric light and electric power, and should be given the use of all the streets, alleys, and public places in said city as required for the placing of poles and the hanging of wires for the aforesaid purposes; that to pay therefor the city should issue its interest-bearing bonds whereby all property in said city would be taxed for the purpose of rebuilding, equipping, and operating said electric light plant in practical competition with complainants. This ordinance was submitted to the voters of the city by special election held therefor on the 26th day of June, 1909, and on the 13th day of July, 1909, the council passed an ordinance declaring the result of the election, ratifying and approving the ordinance. This was followed by a contract between the city and the defendants Knapp and Martin for the erection and construction of the new municipal plant, and providing for the placing of poles and wires along, over, and through the streets and alleys of the defendant city. The complainant, contending that the granting and passage of the ordinance authorizing the defendant city to build and operate such electric light plant is in violation of the contract claimed to exist between the city and the complainant, under and by virtue of which the complainant constructed and is now operating its plant, filed this suit on the 20th of July, 1909, alleging the impairment of the obligation of its contract in violation of the rights guaranteed to it by the Constitution of the United States. Both parties appear to have been content to permit the matter to remain in statu quo until final determination. No restraining order was issued.

Defendants by their answer deny that the city at any time entered into a contract with H. Ward Hicks which subsequently inured to the complainant, claiming that such a contract to be binding must be in writing, dated when made, and subscribed by the parties thereto or their agents authorized by law and duly appointed and authorized in writing, and denying that the ordinances referred to constituted any such contract, or that such ordinances were passed in accordance with law. Defendants further contend that there is no proof before the court of the existence of such ordinances, nor that said ordinances were ever presented to the mayor for his approval, nor that he ever did approve the same; that the record does not show that said purported ordinances were passed by bill; that a bill of any character was ever introduced by any member of the board of aldermen; that the yeas and nays were entered on the journal, nor that the bill was read three times before its final passage, as required by statute. Defendants insist that Ordinance No. 107 granted no exclusive rights except to the furnishing of electricity for mechanical purposes; also, that com-

plainant has abandoned its suit in this court by voluntarily thereafter bringing a suit in the state court involving the same issues. Complainant urges that an ordinance when accepted by a public service corporation constitutes a contract; that the ordinances were passed by bill and duly approved by the mayor; that the statutory provision requiring the yeas and nays to be called and entered on the journal was substantially complied with, and that, in any event, the municipality is now estopped from pleading the irregularity, if one exists; that the suit subsequently brought in the state court was merely to prevent criminal prosecution against the officers of the complainant company growing out of an ordinance alleged to conflict with the rights granted to complainant, and to prevent annoyance and a multiplicity of suits while the present action was pending; that the two bills are radically different in object and scope. It also asserts that the ordinance contract between complainant is abundantly proved, and that the exclusive rights extend to all the instrumentalities enumerated in the ordinance.

[1] Little difficulty is experienced in disposing of most of the contentions urged by the defendants. Under section 1589 of the Revised Statutes of Missouri, then in force, the city of Monett in 1893 had undoubted authority to contract with the complainant, giving and granting the exclusive right to furnish a system of electric light works for the use of the city and its inhabitants for any length of time not to exceed 20 years. Water Company v. City of Aurora, 129 Mo. 540, 31 S. W. 946; Vicksburg Waterworks Co. v. Vicksburg, 185 U. S. 65–82, 22 Sup. Ct. 585, 46 L. Ed. 808; Water, Light & Gas Company v. Hutchinson, 207 U. S. 385–393, 28 Sup. Ct. 135, 52 L. Ed. 257; Water Company v. City of Neosho, 136 Mo. 498, 38 S. W. 89. If, therefore, the city has entered into such a contract with the complainant or its assignor, such contract is protected by the Constitution of the United States against state legislation to impair it. Walla Walla v. Walla Walla Water Co., 172 U. S. 1–10, 19 Sup. Ct. 77, 43 L. Ed. 341. And an ordinance legally adopted, accompanied by all legal requirements and properly accepted, constitutes a contract within the meaning of the Missouri statute conferring this power upon municipalities. Vicksburg v. Waterworks Company, 202 U. S. 453–462, 26 Sup. Ct. 660, 50 L. Ed. 1102; Aurora Water Co. v. City of Aurora, 129 Mo. 540, 31 S. W. 946. The signature of the mayor to the ordinance was a sufficient signing of the contract by the city; he being its lawfully authorized agent, and the acceptance of the terms of the contract contained in the ordinance by letter by the person contracting with the city was all that was necessary to complete the contract, it being unnecessary that the terms of a contract be contained in one paper signed by the party to be charged, in order to make it binding. Water Company v. City of Aurora, 129 Mo. 540, 31 S. W. 946.

[2] When such power is given to a municipality and a contract is made with an individual or a corporation to perform the public service exclusively, then it is an impairment of the obligation of the contract within the constitutional meaning of the term, when the municipality elects to enter the public service itself. Walla Walla City

v. Walla Walla Water Co., 172 U. S. 1–11, 19 Sup. Ct. 77, 43 L. Ed. 341; Vicksburg v. Waterworks Co., 202 U. S. 453, 465, 470, 26 Sup. Ct. 660, 50 L. Ed. 1102; Vicksburg v. Waterworks Co., 206 U. S. 496–508, 27 Sup. Ct. 762, 51 L. Ed. 1155.

So-called Ordinance No. 107 provides:

"Be it ordained by the Board of Aldermen of the City of Monett, Mo.:

"Section 1. The exclusive rights and privileges be, and the same are hereby granted (subject to ratification by the qualified voters of the city of Monett, Mo. voting at a special election to be called for the purpose, and to be held on February 16th, 1893) to H. Ward Hicks of Monett, Mo. and to his successors or assigns, to erect, construct, operate, furnish and maintain electric light works, and electric power plant to furnish electric light and electric power for use, for mechanical purposes, by necessary and suitable means, material, machinery and apparatus for the furnishing of such electric light and electric power, in the city of Monett, Mo."

This ordinance is signed as follows:

"Passed February 4th, 1893, T. H. Jeffries, Prest. Board of Aldermen; approved Feb. 4th, 1893, A. W. Brown, Mayor. Attest: A. V. Darroch, City Clerk. [Municipal Seal.]"

It is obvious that this ordinance undertook to grant exclusive rights and privileges to the grantee, his successors, or assigns; and by section 5 of the ordinance it was provided that said "rights and privileges in the franchise granted, shall continue and remain in force for a term of twenty (20) years." Defendants claim that the exclusive rights referred to are limited to electricity for mechanical purposes. It is difficult to perceive any plausible ground upon which this contention can be sustained. The ordinance is entitled, "An ordinance granting to H. Ward Hicks, his successors or assigns, the exclusive right to construct, operate, furnish and maintain electric light and electric power, within the City of Monett, Missouri," and the body of section 1, though somewhat loosely drawn and exhibiting scant regard for the niceties of punctuation, clearly evinces the purpose of extending the exclusive rights and privileges contemplated to all the electrical uses and instrumentalities therein enumerated.

[3] Moreover, the ordinance purports to be duly signed by the mayor, which sufficiently establishes the presumption that it was regularly presented to that officer for his approval, and that he did, in fact, approve it, as recited upon the copy of the ordinance shown in evidence. Saleno v. City of Neosho, 127 Mo. 627, 30 S. W. 190, 27 L. R. A. 769, 48 Am. St. Rep. 653. Ordinances 108 and 110 are similarly signed. It is shown in the proofs that complainant, through its officers and agents, made attempts at various times to obtain the original ordinances for use as evidence in this and other litigation; that it was then developed that these ordinances were lost or misplaced, at least, could not be found in the possession of their proper custodian. The complainant company, however, had in its possession copies made at the time of all the ordinances, together with other proceedings connected with the acceptance of this franchise, all of which had been carefully compared by the original grantee and the then city clerk of the city of Monett, in whose custody they were properly lodged. The clerk then and there certified them to be true copies,

and further attested the same by affixing thereto the corporate seal of the city. He also testified from his personal recollection both of the ordinances and of the circumstances attending the comparison of these copies with the originals.

[4] While the certification is not formal, it is considered, under the circumstances detailed in the proofs, that the copies offered were sufficiently authenticated and identified as true copies of the lost originals, and no weight is given to the defendants' contention in this regard. The journal entries produced also sufficiently establish that the council certainly attempted to pass such ordinances upon the dates when they purport to have been adopted.

The suit in the state court of Barry county, Missouri, by the bringing of which, defendants contend, complainant abandoned this action and deprived itself of the benefit of the federal jurisdiction, was brought to restrain the city of Monett, its mayor and common council, city attorney, and police judge from arresting or causing the arrest of the officers and employés of complainant for any alleged violation of a certain ordinance of that city purporting to regulate telephone, telegraph, and electric light companies in the matter of locating their poles and extending their wires over or through the streets, alleys, and avenues of said city. Complainant claims that it was rightfully exercising the powers granted by the franchise here involved. The purposes of the bill and the relief prayed were in no way identical with those sought under the bill filed in this case, nor were they in any sence inconsistent therewith. Under the holding in Harkrader v. Wadley, 172 U. S. 164, 19 Sup. Ct. 119, 43 L. Ed. 399, complainant conceived that its remedy to protect itself against criminal prosecutions, growing out of issues which were in litigation in the federal court, lay in the state court whose protection was thus invoked. Without discussing the effect of a voluntary appeal by complainant to the state court upon the same issues upon which it had theretofore invoked the federal jurisdiction, it is sufficient, for our present purposes, to say that such a question is not here presented.

[5] The objection to the validity of the ordinances, because of irregularities incidental to their passage, presents much more serious considerations. The contract between complainant and the city consisting entirely of the ordinances and its acceptance, if the ordinance is invalid the contract must necessarily fall. Section 1597, Revised Statutes of Missouri 1889, applying specially to cities of the fourth class, provides:

"No ordinance shall be passed except by bill, and no bill shall become an ordinance, unless on its final passage a majority of the members elect shall vote therefor, and the yeas and nays entered on the journal; and all bills shall be read three times before their final passage."

The journal entry recording the proceedings of the board of aldermen of the city of Monett on the 4th day of February, 1893, is as follows:

"The board of aldermen of Monett met on the above date at 8 o'clock p. m. with the following officers present: A. W. Brown, mayor, John Gillis, Pat Martin, J. J. Davis and A. W. Lyman, aldermen.

"Among other business and proceedings, the following was had:

"Ordinance No. 107. An ordinance entitled an ordinance granting to H. Ward Hicks, his successors or assigns the exclusive right to construct and maintain electric light and electric power within the city of Monett, Missouri, was presented, passed to its second and third reading and upon motion adopted.

"Yeas, five, and nays, none.

"An ordinance entitled 'An ordinance calling a special election to submit to the qualified voters of Monett, Missouri, a proposition to grant to H. Ward Hicks, his successors or assigns, the exclusive right to construct, operate, furnish and maintain electric light and electric power within the city of Monett, Missouri' was presented, passed to the second and third reading and was on motion declared adopted. Yeas, five, nays, none."

The yeas and nays were not entered on the journal. It therefore becomes necessary to the validity of this ordinance to establish from the record that the object of the statute has been substantially fulfilled. Before proceeding to a consideration of this question, the composition of the board of aldermen and its custom of transacting business should be noted. The board was evidently composed of six aldermen. This appears from the following matters of evidence: The proclamation calling the special election to vote upon the granting of this franchise designates polling places in three wards of the city. Ordinance No. 110, declaring the result of that election, gives the vote by wards, and specifies three wards. It therefore sufficiently appears that there were three wards, and only three wards, in the city at that time. We may further reasonably infer from the record that each ward was represented by two aldermen. As many as five are named in connection with the proceedings of the council in this matter, and the total number is further indirectly shown in the testimony of the witness Darroch, city clerk at the time these ordinances were before the council. I quote from his testimony as follows:

"Q. Did you know that the statute required that the ayes and noes should be recorded of the passage of all ordinances? A. I wish to make an explanation of what I understand. The mayor would say 'All in favor of this say aye.' Four would say 'Aye.' Then he would say 'Opposed, no.' And two would say 'No.' The clerk would put it down 'Ordinance carried four ayes and two noes.' But, if some member said 'I want the vote recorded,' then the clerk would put down 'Mr. ——— aye,' and 'Mr. ——— aye,' and 'Mr. ——— no.' The party's name who voted 'No' would go down and his vote would go down with it.

"Q. But in the passage of the Ordinance 107 you did not do that? A. No, sir; when an ordinance was passed unanimously, there was no record of the name, but just 'six ayes.' *  *  * A. I wish to state that what I mean and what was the general custom at the time about the ayes and noes being called and recorded. If one or more members of the board of aldermen demanded it, the ayes and noes were called. If a member voted 'No,' his name was recorded with the word 'No' after it. If a member voted 'Aye,' his name was recorded and the word 'Aye' after it. Otherwise, the mayor would in a general way declare 'the ordinance is carried, four ayes and two noes.'

"Q. If all voted 'aye,' how would it be recorded? A. Six ayes."

From this testimony it further sufficiently appears that the board was composed of six aldermen, and that it was not the custom to record the ayes and nays upon the passage of ordinances, as required by statute, unless a roll call was demanded.

It will be observed that the statute makes the entering of the yeas

and nays upon the journal a condition precedent to the existence of a valid ordinance. It says "no bill shall become an ordinance" unless on its final passage this is done. Does the record show a substantial compliance with that statute? Complainant asserts that it does, and cites in support of his contention the language of Justice Cooley in Steckert v. City of East Saginaw, 22 Mich. 104. There the minutes showed the ordinance was adopted unanimously on roll call, and the discussion was under a Michigan statute similar to that of Missouri. Counsel quoted from the opinion as follows:

"The purpose, among other things, is to make the members of the common council feel the responsibility of their action when these important measures are upon their passage, and to compel each member to bear his share in the responsibility by a record of his action, which should not afterwards be open to dispute. Now, if the record in the present case shows precisely who voted for the resolution in question, it is apparent that the object of the statute has been fulfilled, and we may be able to sustain the action, notwithstanding the compliance with its provisions has not been exactly literal."

This language, standing alone, seems to convey a message of hope and promise to the complainant in this case, but counsel evidently neglected to read the remainder of Justice Cooley's argument, or failed to apprehend his final conclusion. His discussion of the subject is so complete, and so convincing, that it may fairly be said to announce the settled law upon this question, and is worthy of being set out in full in a matter of this importance. He said:

"The argument is that the record shows, first, the names of the several aldermen who were present when this action was had; second, that the roll was called on the vote; and, third, that each of them when the roll was called voted for the adoption of the resolutions. This being so, the vote is, in effect, entered at large on the minutes, and the repetition of the names of the aldermen in the minutes, when the precise position of each upon the resolutions submitted was already recorded, would have been only an idle ceremony, accomplishing no useful purpose.

"We have found ourselves unable to take the same view of this record that is taken by the counsel for defendants. There can be no doubt that the provision of the statute which requires these votes to be entered at large on the minutes was designed to accomplish an important public purpose, and that it cannot be regarded as immaterial, nor its observance be dispensed with. Spangler v. Jacoby, 14 Ill. 297 [58 Am. Dec. 571]; Supervisors of Schuyler Co. v. People, 25 Ill. 183. * * *

"We are of opinion that the record does not show with sufficient certainty that all the members present at roll call, at the opening of the meeting in question, voted for the resolutions; and, if it does not show that all did, it does not show that any particular one of them did. What it does show is that at roll call when the meeting was opened certain members named were present, and that afterwards, before the meeting adjourned, certain resolutions were adopted unanimously on call. Now if it were a legal presumption that all the members who were present at the call to order of such a meeting remained until its adjournment, and that no others came in and took their seats afterwards, and if it were also a presumption that every member voted on each resolution on roll call, the argument of defendants would be complete, and we could say with legal certainty from this record that these resolutions were passed with the affirmative vote of each of the members named as present in the clerk's minutes of the meeting in question.

"But surely there are no such presumptions of law, and, if there were, they would be contradictory to the common experience of similar official bodies. It is very well known that it is neither observed nor expected that, when a legislative body of any grade has commenced its daily session, the doors will be closed to prevent the ingress of members not prompt in arrival, or the

egress of others who may have occasion to leave. The actual attendance on such a body will frequently be found to change materially from hour to hour, so that a record that a vote was passed unanimously would be very slight evidence that any particular member present at the roll call voted for it, or that any member not then present did not. And, even if the record could be held to afford a presumption on that subject, its character must be so faint, doubtful, and unreliable as to subserve no valuable purpose. Moreover, the members actually present are usually allowed to vote or not to vote at their option, except in cases of close votes, or where an appeal is to be made to the people; and, if the vote of a quorum is in favor of a resolution and no vote is cast against it, the record may still be that it was 'adopted unanimously on call,' though some of the members present abstained from voting.

"What is designed by this statute is to fix upon each member who takes part in the proceedings on these resolutions the precise share of responsibility which he ought to bear, and that by such an unequivocal record that he shall never be able to deny either his participation or the character of his vote. But manifestly we cannot determine in the present case with any certainty that any one of the aldermen named—Alderman Buchout, for example—actually voted for the resolutions in question. We know he was present when the council convened, but we have no record which points specifically to his individual action afterwards. Suppose he were to contest the tax as illegal, and the city authorities were to insist upon an equitable estoppel arising upon his vote in its favor, and he should deny such vote, we should look in vain in this record for anything absolutely inconsistent with such denial. Suppose his constituents, dissatisfied with this vote, undertake to call him to account for his participation, and he were to say to them, 'I was not present when these resolutions were adopted. I was indeed present when the council convened, but was called away soon after on private business.' This record plainly could not be relied upon to contradict his assertion. The persons arraigning him would be obliged, in order to fix his responsibility, to resort to the parol evidence of his associates or of bystanders. But the Legislature understood very well the unsatisfactory character of that kind of evidence, and they did not intend that the power to call an alderman to account for misconduct, delinquencies, or errors of judgment in the performance of this official duty should be left to depend upon it. They have imperatively required that there should be record evidence of a character that should not be open to contradiction, or subject to dispute; and their requirement cannot be complied with according to its terms, nor satisfied in its spirit and purpose, without entries in the minutes showing who voted on each resoluton embraced by the section quoted from the charter, and how the vote of each was cast. In other words, the ayes and noes on each resolution must be entered at large on the minutes, so that presence or participation of any member shall not be left to conjecture or inference."

His conclusion is that such a journal entry does not comply with the statute, which is mandatory in this regard, and therefore invalidates the ordinance.

The journal entry in the case at bar is still more open to criticism. That of February 4th, on which date Ordinances No. 107 and 108 were before the council, recites that there were present when the board met at 8 o'clock: A. W. Brown, mayor, John Gillis, Pat Martin, J. J. Davis, and A. W. Lyman, aldermen. In each case the record upon the third reading was yeas, five, and nays, none. As there were but four aldermen named as being present, it conclusively appears that at least one additional member of the council, name unknown, joined the meeting later and voted. It cannot be determined which of the two remaining councilmen it was. Again, it is possible that one of those present at the opening may have retired, and both of the remaining council may subsequently have appeared, thus making

up the five who voted. Nor, if one of those originally present did retire, can it be stated which one so absented himself. In other words, each one of the then six aldermen of Monett could plead an alibi, covering the passage of those ordinances, with no possible danger of contradiction by any record. In the light of Judge Cooley's reasoning the weakness of this entry clearly appears. In the case of Ordinance No. 110 the discrepancy, while not so glaring, is nevertheless apparent. Counsel for complainant further say that "similar statutory provisions to the one in question have been before the courts, and they are usually held to be directory." Unfortunately the authorities cited do not justify this view. In Wiggin v. New York, 9 Paige (N. Y.) 16, the question was not directly passed upon; it being held that if the proceedings were absolutely void in law, and that fact appears upon the face of the ordinance itself, a sale for the assessment upon the complainant's lots would not even create a cloud upon his title, and therefore equity would not relieve. What the court did say was that:

"The publication of the report and of the ayes and noes upon the question of the adoption of the ordinance for the proposed improvement was directory. The neglect to make such publication did not, therefore, of itself, render the proceedings void, if the ordinance was not void upon the face of the record of its adoption."

City of Logansport v. Dykeman et al., 116 Ind. 15, 17 N. E. 587, had under consideration a relation between the parties far different from that here presented, as will hereafter be considered. However, the court there did say:

"Where the statute requires that the contract be made in a certain form, or in pursuance of a certain mode, in such cases the common council exercise a special statutory power in relation to the contract, and where a mode of procedure is prescribed, and the conditions and form of the contract are matters of statutory regulation, both the mode of procedure and form of the contract must be substantially observed."

State ex rel. v. Mead, 71 Mo. 266, has to do with certain constitutional forms of affecting legislative acts which are not declared to be essential in order that a bill shall become a law. The court said:

"We are convinced that the initial clause of the section that 'no bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session' is mandatory, though it is quite evident that the mandate of the Constitution would be obeyed, so far as concerns proper authentication of the bill, when it receives the signature of the respective presiding officers in open session. But we do not regard the other clauses of the section under review as mandatory; for it is to be observed that those clauses do not declare officers or the members fail to perform the duties which the residue of the section imposes, but the only penalty directly expressed is that contained in the initial clause just noted." Loc. cit. at page 271, of 71 Mo.

That case refutes rather than supports the argument of counsel. This precise question was more directly passed upon by the Supreme Court of Missouri in Water Company v. City of Aurora, 129 Mo. 540–577, 31 S. W. 946, 955, where the court said:

"Nor does it invalidate that ordinance because, as it is claimed, it was not read three times before its final passage. Section 1597, Revised Statutes 1889, provides: 'No ordinance shall be passed except by bill, and no bill shall be-

come an ordinance, unless on its final passage a majority of the members elect shall vote therefor, and the yeas and nays entered on the journal; and all bills shall be read three times before their final passage.' It is to be observed that the above section does not declare a sentence of nullity against a bill which is not read three times before its final passage. Such declaration is altogether confined to the preceding clauses of the section, and does not apply to the last clause."

So that it may be stated as the settled law, as announced by the highest court of this state, that under this section of the statute the failure to enter the yeas and nays upon the journal is fatal to the validity of the ordinance.

[6] Evidently anticipating this conclusion, counsel submit argument and cite authorities in avoidance of its necessary effect. They say:

"If it be conceded that the statutory requirements calling the ayes and noes and entering the ordinance of record or any other statutory provisions were not complied with, still no defense is shown against the enforcement of this contract. It has long been established that, when a municipal corporation irregularly enters into a contract which it is authorized to enter into and the contract becomes executed and the municipality has received the benefit of the contract, it cannot thereafter set forth the irregularity or lack of statutory requirements in the entering into of said contract."

And for this announcement Hitchcock v. Galveston, 96 U. S. 341, 24 L. Ed. 659, is cited as authority. In that case the city council was vested with power to cause sidewalks in the city to be constructed, and entered into a contract with Hitchcock and Byrnes for the doing of the work. By the same contract the city engaged to pay the plaintiffs in bonds of the city, which would have amounted to more than $50,000, a sum beyond the amount that the charter authorized the council to borrow for general purposes. The bond issue being ultra vires, the city declared the entire contract void and refused to pay for the public improvement which had already been furnished and of which the city had received the benefit. The court said:

"It matters not that the promise was to pay in a manner not authorized by law. If payments cannot be made in bonds because their issue is ultra vires, it would be sanctioning rank injustice to hold that payment need not be made at all. Such is not the law. * * * Having received benefits at the expense of the other contracting party, it (the city) cannot object that it was not empowered to perform what it promised in return, in the mode in which it promised to perform."

The city clearly had the power to contract for these improvements. It received the benefits, and this raised the implied obligation to pay for them. That is the entire scope of the holding in Hitchcock v. Galveston, supra. This has been made clear by numerous later decisions of the same court.

In Louisiana v. Wood, 102 U. S. 294, 26 L. Ed. 153, the city put out some bonds with a false date, and thus represented that they were valid without registry. The court said:

"The bonds were bought and the price was paid under the belief that they had become valid before the registry law went into effect. It would certainly be wrong to permit the city to repudiate the bonds and keep the money borrowed on their credit. * * * While, therefore, the bonds cannot be enforced, because defectively executed, the money paid for them may be recovered back."

In other words, the contract was invalid as such, but the implied obligation remained to return the money unlawfully had and received.

In Chapman v. County of Douglas, 107 U. S. 348, 2 Sup. Ct. 62, 27 L. Ed. 378, the decision of the court in Hitchcock v. Galveston is cited and approved; its meaning being indicated by the following language:

"The money of the plaintiff was taken and is still held by the defendant under an agreement which it is contended it had no power to make, and which, if it had power to make, it has wholly failed on its part to perform. It was money of the plaintiff, now in the possession of the defendant, which in equity and good conscience it ought now to pay over, and which may be recovered in an action for money had and received. * * * The corporation is the only one at fault in exceeding its corporate powers by making the express contract. The plaintiff is not seeking to enforce that contract, but only to recover his own money and prevent the defendant from unjustly retaining the benefit of its own illegal act. He is doing nothing which must be regarded as a necessary affirmance of an illegal act."

This principle is again enunciated by the Supreme Court in Marsh v. Fulton, 10 Wallace, 676, 19 L. Ed. 1040, in which it was held:

"Where county bonds to a railroad company are issued without any authority, they are invalid in the hands of an innocent purchaser. The authority to contract must exist before any protection as innocent purchaser can be claimed by the holder. * * * We do not mean to intimate that liabilities may not be incurred by counties independent of the statute. Undoubtedly they may be. The obligation to do justice rests upon all persons, natural and artificial, and, if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation. But this is a very different thing from enforcing an obligation attempted to be created in one way, when the statute declares that it shall only be created in another and different way."

In Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24–57, 11 Sup. Ct. 478, 487, 35 L. Ed. 55, the court said:

"In Salt Lake City v. Hollister, above cited, it was said that, in cases of contracts upon which corporations could not be sued because they were ultra vires, 'the courts have gone a long way to enable parties, who had parted with property or money on the faith of such contracts, to obtain justice by recovery of the property or the money specifically, or as money had and received to the plaintiff's use.' 118 U. S. 263 [6 Sup. Ct. 1055, 30 L. Ed. 176]. The true ground of relief in such cases is clearly shown in a line of opinions, two of which were cited by Mr. Justice Miller in support of the proposition just quoted, in which municipal corporations, having received money or property under contracts so far beyond their powers as not to be capable of being enforced or sued on according to their terms, have been held, while not liable to pay according to the contracts, to be bound to account for the money or property which they had received."

The proposition is again succinctly stated in Logan County Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107, as follows:

"So in Parkersburg v. Brown, 106 U. S. 487–503 [1 Sup. Ct. 442, 27 L. Ed. 238], involving the liability of a municipal corporation upon bonds issued in its name and secured by deed of trust given by the person to whom they were loaned, and which bonds were held to be void for want of authority to execute them, the court said: 'But, notwithstanding the invalidity of the bonds and of the trust, the O'Briens had a right to reclaim the property and to call on the city to account for it. The enforcement of such right is not an affirmance of the illegal contract, but is a disaffirmance of it, and seeks to prevent the city from retaining the benefit which it has derived from the unlawful act.'"

In Thomas v. Railroad Co., 101 U. S. 71, 25 L. Ed. 950, a somewhat analogous situation arose. A railroad company made a lease beyond its powers for a period of 20 years. The lease provided that the company might at any time terminate the contract and retake possession of the railroad, and that in such case, if the plaintiff so desired, the company would appoint an arbitrator, who, with one appointed by them, should decide upon the value of the contract to them, and the loss and damage incurred by reason of such termination. About 4 years later the lessor terminated the lease, which by its terms had still 16 years to run, and the lessee requested arbitration, which was refused, and suit was brought. The contract was a valuable one for the balance of the term to the lessees. It was held that a lease by a railroad company of all its road, rolling stock, and franchises for which no authority is given in its charter is ultra vires and void. The court, through Mr. Justice Miller, said:

"In regard to corporations, the rule has been well laid down that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it. But what is sought in the case before us is the enforcement of the unexecuted part of this agreement. So far as it has been executed, namely, the four or five years of action under it, the accounts have been adjusted, and each party has received what he was entitled to by its terms. There remains unperformed the covenant to arbitrate with regard to the value of the contract. It is the damages provided for in that clause of the contract that are sued for in this action. Damages for a material part of the contract never performed; damages for the value of a contract never performed; damages for the value of a contract which was void. It is not a case of a contract fully executed. The very nature of the suit is to recover damages for its nonperformance. As to this, it is not an executed contract. Not only so, but it is a contract forbidden by public policy and beyond the power of the defendants to make."

Respecting the right to insist upon performance under such conditions, the court said:

"To hold that they can is in our opinion to hold that any act performed in executing a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts. We cannot see that the present case comes within the principle that requires that contracts which, though invalid for want of corporate power, have been fully executed, shall remain as the foundation of rights acquired by the transaction."

These quotations from the decisions of the court of last resort make clear the distinction between cases in which relief may be granted and those in which it must be denied. As was said in Marsh v. Fulton, supra:

"The obligation to do justice rests upon all persons, natural and artificial, and, if a county obtains money or property of others without authority, the law, independent of any statute, will compel restitution or compensation. But this is a very different thing from enforcing an obligation attempted to be created in one way, when the statute declares that it shall only be created in another and different way."

To the former class belong the cases cited by counsel for complainant, to wit, First National Bank v. Guardian Trust Co., 187 Mo. 528, 86 S. W. 109, 70 L. R. A. 79; Water Co. v. City of Aurora, 129 Mo. 583, 31 S. W. 946; Chicago v. Union Stockyards, etc., 164 Ill. 224,

45 N. E. 430, 35 L. R. A. 281; City of Logansport v. Dykeman, 116 Ind. 15, 17 N. E. 587; Forrest City v. Orgill, 87 Ark. 389, 112 S. W. 891; Hitchcock v. Galveston, 96 U. S. 341, 24 L. Ed. 659. To the latter class belong Thomas v. Railroad Company, 101 U. S. 71, 25 L. Ed. 950, and the case at bar.

It may be urged that here the authority to contract existed, but was irregularly exercised. But we are here dealing with a subject-matter to which the rule of strict construction is uniformly applied. Courts will not give effect to ultra vires contracts of municipal corporations. The party dealing with the corporation is under no obligation to enter into the contract, and does so at his peril. No force or restraint or fraud is practiced on him. These powers of these corporations are matters of public law open to his examination, and he may and must judge for himself as to the power of the corporation to bind itself by the proposed agreement. 8 Michie's Encyc. of U. S. Supreme Court Reports, p. 577, and cases cited. A contract stipulating away governmental functions is strictly construed. Rogers Park Water Co. v. Fergus, 180 U. S. 624–628, 21 Sup. Ct. 490, 45 L. Ed. 702. The charter and statutory method of the contract must be specifically followed and proved, and the obligation must be created in the way the statute provides, and no other. Fanning v. Gregoire, 16 How. 523–533, 14 L. Ed. 1043; Bloomfield v. Charter Oak Bank, 121 U. S. 121–135, 7 Sup. Ct. 865, 30 L. Ed. 923; Marsh v. Fulton, 10 Wall. 676–684, 19 L. Ed. 1040. And such a contract is to be governed by the local law. City of Memphis v. Brown, 20 Wall. 289, 22 L. Ed. 264. Exclusive franchises are not favorites of the law.

"Restraints upon governmental agencies will not be readily implied. There are presumptions against the granting of exclusive rights and against limitations upon the powers of government." City of Joplin v. Southwest Missouri Light Co., 191 U. S. 150, 24 Sup. Ct. 43, 48 L. Ed. 127.

"Only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government or the public has an interest. Statutory grants of that character are to be construed strictly in favor of the public. Whatever is not unequivocally granted is withheld; and nothing passes by implications." Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 Sup. Ct. 224, 50 L. Ed. 353; Vicksburg v. Waterworks Co., 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102.

"Grants by the state to municipal corporations, like grants to private corporations, are to be strictly construed." Water, Light & Gas Co. of Hutchinson v. City of Hutchinson, 207 U. S. 385, 28 Sup. Ct. 135, 52 L. Ed. 257.

If it be said that this decision is based upon technical grounds a sufficient answer is that the complainant seeks to enforce rights and privileges which are most jealously guarded by courts and legislative bodies, and which are uniformly most strictly construed in favor of the public. It devolved upon the grantee herein to assure himself, not only of the right of the city to contract, but that it had exercised its powers in accordance with law. The safety of his investment depend-

ed upon his vigilance. While complainant has expended a considerable sum in the construction and operation of this plant, it has also for a period of nearly 18 years enjoyed the benefits of what has been, in effect, an exclusive grant. The city has received and appropriated to its own use no money or property of the complainant. The service rendered to it and its inhabitants has been paid for. There are no unsettled balances between the parties, so far as the record discloses, nothing which, under the rule laid down in Hitchcock v. Galveston, should in equity and good conscience be returned to the complainant. The plant, well-nigh worn out, requires rebuilding. It is complained that the present service is unsatisfactory. The city and the public service corporation appear to be hopelessly at cross-purposes, and the city insists that it be permitted to install its own lighting plant, and that a contract void from the beginning shall not be enforced as an exclusive one during the remaining two years of its assumed life. No question of confiscation is here presented. The mere right of municipal competition is asserted. But, even though this construction might involve some hardship to the complainant, no court can afford to relieve a hard situation at the expense of unsound interpretation to invade the province of the Legislature and set at naught the plain mandate of a statute founded alike upon the will of the lawmakers and consideration of sound public policy.

It follows from the conclusion reached that the bill must be dismissed, and it is so ordered.