# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 15, 2007          Decided April 10, 2007

No. 06-7096

ROBERT BRUBAKER,
FOR HIMSELF AND OTHERS SIMILARLY SITUATED AND
MARGARET C. HAYES, FOR HERSELF
AND OTHERS SIMILARLY SITUATED,
APPELLANTS

v.

METROPOLITAN LIFE INSURANCE COMPANY AND
METROPOLITAN LIFE RETIREMENT PLAN
FOR UNITED STATES EMPLOYEES,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02511)

———

*Joseph N. Kravec, Jr.* argued the cause for appellants.
With him on the briefs was *William T. Payne*.

*Emmett B. Lewis, III* argued the cause for appellees.
With him on the brief were *Alan I. Horowitz*, *Anthony F.
Shelley*, and *Laura G. Ferguson*.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In November 1992 the Metropolitan Life Insurance Company ("MetLife") sent out a letter announcing a one-time supplemental payment of no less than $500 to MetLife "retirees" who "retired" prior to January 1, 1988. By mistake, it also sent the letter to a number of former employees who had left MetLife before retirement. Plaintiffs are a former MetLife employee and the widow of another; neither former employee had retired from MetLife. Although apparently not recipients of the letter, plaintiffs brought suit under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, claiming entitlement to the benefit. Assuming arguendo that MetLife's mailing the 1992 letter could have created such an obligation if its language had encompassed plaintiffs, we hold that the term "retired," read in context of applicable pension plan documents, did not include such individuals. We therefore affirm the district court's award of summary judgment for the defendants.

* * *

Since at least 1949, MetLife has offered an employee pension plan. See Insurance and Retirement Program for Agents in the United States, Mar. 1949, Joint Appendix ("J.A.") 533-46 ("1949 Program"). MetLife's 1949 Program provided a retirement annuity, group life insurance, and disability benefits and remained in effect until superseded in 1976. The 1976 and subsequent revisions stated, however,

that the 1949 Program would continue to apply to employees "whose employment terminated on or before January 1, 1976." See 1976 Plan at 18 § 5.01, J.A. 2147; 1989 Plan at 28 § 5.01, J.A. 2176; 1994 Plan at 37 § 5.01, J.A. 2199; 2001 Plan at 50 § 5.01, J.A. 2133.

Under the 1949 Program an employee "continuing as a contributor [to the] Retirement Annuity until normal retirement date" was entitled to receive an annuity calculated under schedules laid out in the Program. 1949 Program at 13. (The Program made special provision for employees who "retired" earlier or later under carefully limited circumstances usually including the agreement of the company. *Id*. at 19-20.) In addition, employees who "terminated" their MetLife agency prior to the normal retirement date (but not under the optional retirement arrangements) could enjoy benefits. If they had reached their 35th birthday and worked for MetLife for five years at the time of termination, they could elect to receive either a one-time cash payment or a "Paid-up Deferred Annuity payable at [the] normal retirement date." *Id.* at 16.

Plaintiff Robert L. Brubaker worked for MetLife from 1953 until 1961, when he left the company and worked (for the next thirty-five years) for one of MetLife's competitors. Plaintiff Margaret C. Hayes is the widow of Francis X. Hayes, who worked for MetLife for several decades until 1964 and then for the Government Printing Office until 1976. Under the 1949 Program, both Brubaker and Francis Hayes qualified and opted for "Paid-up Deferred Annuit[ies]" on termination of their employment at MetLife. See J.A. 1897, 1937-40. Thus, by the unequivocal usage of the 1949 Program, neither of them "retired."

MetLife's November 18, 1992 letter announced "a special one-time pension payment . . . to all employees who retired

prior to January 1, 1988," valued at the greater of $500 or $25 for each year of "retirement plan service." "Surviving spouses . . . who began receiving pension payments prior to January 1, 1988" would also get the payment. Letter from MetLife CEO Robert G. Schwartz to My Retired Metlife Associates and Spouses, Nov. 18, 1992, J.A. 2278-79. In January 1993, on discovery that the letter had been sent to some deferred annuitants, MetLife wrote to those individuals, stating that they weren't eligible for the one-time payment. Letter from Vice-President James N. Heston to Former MetLife Employees with a Deferred Vested Annuity Benefit, Jan. 14, 1993, J.A. 2318.

Several years later Brubaker wrote to MetLife, claiming entitlement to certain benefit enhancements, including the 1992 one-time payment. (The other claims have been abandoned en route to this court.) MetLife's plan administrator denied the claim on the ground that the increase "applie[d] only to eligible employees who had retired . . . directly from Company service," not individuals such as Brubaker "whose termination of Company service occurred prior to retirement age, even though [such individuals] were entitled to retain a Deferred Annuity." Letter from Jo Boudreau, Benefits Consultant, to Robert L. Brubaker, Apr. 25, 2000, J.A. 1890.

After several requests for reconsideration, Brubaker filed suit in district court in October 2000. He amended his complaint in January 2001 to add Margaret Hayes. The district court remanded Brubaker's claim to the plan administrator for a complete review and development of the administrative record. The plan administrator again denied Brubaker's claim. See Letter from James N. Heston, Senior Vice President and Plan Administrator, to Robert L. Brubaker,

Dec. 8, 2003, J.A. 2041-51. Following discovery, the district court granted summary judgment for defendants.

* * *

Brubaker and Hayes raise a number of objections on appeal, most of which are directed at the district court's partial reliance on a 1991 MetLife Summary Plan Description ("SPD"), which that court read as explicitly excluding deferred annuitants from the category of "employees who retired" in the 1992 letter. But we hold that the plain terms of the 1992 letter and 1949 Program exclude deferred annuitants from the intended scope of the one-time payment. This analysis moots plaintiffs' various objections about the district court's reliance on language from the 1991 SPD.

We review a district court's grant of summary judgment de novo, and will affirm if, viewing all evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Allied Pilots Ass'n v. Pension Benefit Guarantee Corp.*, 334 F.3d 93, 97 (D.C. Cir. 2003). Both district and appellate courts interpret benefit plan documents de novo, "unless the terms of the plan 'giv[e] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (alteration in original). MetLife claims the plan here conferred such authority, but we need not reach that question because defendants are entitled to summary judgment even without such deference.

Brubaker and Francis Hayes both terminated their MetLife employment "on or before January 1, 1976," and thus (as they concede) were covered by the 1949 Program. See Appellants' Br. at 20 n.6; Reply Br. at 4-5; 1976 Plan at 18 § 5.01, J.A. 2147. Although the 1949 Program does not explicitly define the terms "retired," "retiree," or "retirement benefits," it is absolutely unvarying in its usage, drawing a clear line between employees who "retired," namely, those who left MetLife after fulfilling the Program's criteria for retirement, and those, such as Brubaker and Francis Hayes, who "terminated" their employment prior to satisfying those requirements but became entitled to a Paid-up Deferred Annuity.

First, the Program explicitly distinguishes between (1) retirement "under the Program" and (2) "termination of agency," which "is deemed to occur" on an employee's "discontinuance as an Agent, *unless he is retired under the Program*." 1949 Program at 14, J.A. 541 (emphasis added). Upon "termination," "all coverage under this Program automatically ceases," except that an employee over age 35 with five years' annuity contributions may, on termination, choose to receive the annuity's "cash surrender value" or a "Paid-up Deferred Annuity payable at normal retirement date . . . the annual rate being equal to that of the Retirement Annuity . . . in force immediately prior to termination of agency." *Id.* at 16. Thus, the term "normal retirement date" has relevance not only for individuals "be[ing] retired" from MetLife, *id.* at 19, but also for deferred annuitants, as it controls the date their deferred payments begin. And the Program applies the phrase "retirement annuity" to the amounts due both to deferred annuitants and to individuals who qualify as "retired." But so far as we can discover, the Program is resolute in confining the verb "retire," the participles "retiring" and "retired," and the gerund "retiring"

to employees who retire from MetLife at the normal retirement date (or at an earlier or later date meeting the stated criteria for retirement).

For example, the Program lays out a number of prerequisites for "be[ing] retired" that reflect this distinction. It defines the "normal retirement date" as the first day of the month nearest to a man's 65th birthday (60th for women), and states that, ordinarily, "each [employee] *shall be retired* on his normal retirement date."  1949 Program at 13, 19, J.A. 540, 543 (emphasis added).  The "annual rate of Retirement Annuity" is defined with respect to an employee "continuing as a contributor for Retirement Annuity until normal retirement date";  such rates are "payable for retirements on or after normal retirement date." *Id.* at 13.  For an agent actively continuing until immediately before his normal retirement date, certain group life insurance arrangements become effective whether or not the employee "then retires."  *Id.* at 10.  The Program makes other explicit references to group life insurance for those "retiring" on or prior to their normal retirement date. *Id*. at 11.

Moreover, the Program permits a contributor (with MetLife's permission) to "continue as an active [employee]" after his normal retirement date "for an additional period not exceeding one year," with further year-by-year extensions possible through the year of an employee's 70th birthday (65th for women). *Id.* at 19.  Similarly, "[b]y mutual consent" an employee "may retire at any date within the 10 years *immediately preceding* the normal retirement date."  *Id.* (emphasis added); see also *id.* at 11 (describing Group Life insurance coverage applicable to employees "retiring prior to [their] normal retirement date").  Each of these provisions clearly encompasses employees who stop working for MetLife on their normal retirement date (or slightly earlier or

later, under limited conditions). In addition, an employee who has not exercised "the option of retiring" earlier than normal may under some circumstances arrange for a reduced retirement annuity in exchange for extended protection of a surviving spouse. *Id*. at 20.

The 1949 Program runs for some 25 pages, so conceivably we may have missed a usage of some form of the verb "retire" to cover deferred annuitants. But at oral argument plaintiffs' counsel could offer no example contradicting the pattern. See Oral Arg. at 4:49 (Q: "Can I summarize your position as being that nothing in the 1949 Plan identifies the deferred annuitants as 'retirees' or as people who 'retired'?" . . . A: "There's nothing expressly that [includes them], but there's nothing that excludes them either. . . . If your question is was there an express use of the word 'retired' to describe deferred vesteds under the 1949 plan, the answer is simply no.").

In light of the consistent usage in the 1949 Program, the 1992 letter's statement that MetLife would provide the lump sum payment to "retirees" who "retired prior to January 1, 1988" applies not at all to deferred annuitants. Where the terms of a contract are clear, that is the end of the matter; we need not look to extrinsic evidence or the parties' subsequent practice. See *Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C. Cir. 1985) ("If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation."); see also Restatement (Second) of Trusts § 164 cmt. e (1959).

Thus we need not wrestle with such matters as plaintiffs' claim that a 1994 version of MetLife's retirement plan shows that MetLife viewed deferred annuitants as "retired" employees. See Appellants' Br. at 40-47; Metropolitan Life

Retirement Plan for United States Employees, Jan. 1994, J.A. 1024-1262. Apart from the fact that their briefs don't point to a single usage in that document of "retiree," "retire," "retired," or "retiring" that is inconsistent with the pattern of the 1949 Program, different usage in other documents wouldn't undercut the clarity of the usage in the 1992 letter and the plan under which Brubaker and Francis Hayes acquired their rights. Nor, of course, would mixed-usage statements by MetLife officials on deposition (if there were such statements—we can find no examples), or evidence of MetLife's occasional administrative miscoding of deferred vested annuitants, see Appellants' Br. at 58-60, smudge the clarity of the pertinent documents.

Suppose the 1992 letter had mistakenly used terms that appeared to encompass 1949 Program deferred annuitants among those to whom MetLife said it "will provide" the one-time benefit? Both sides seem to argue on the assumption that under those circumstances the letter would have created a legal obligation on the part of MetLife. We are not sure why they make that assumption, but under the circumstances we needn't address the issue.

Nor can appellants prevail by citing the contra proferentum canon—a rule "that ambiguities in an insurance contract should be construed against the insurer who drafted the contract." *United States ex rel. Dep't of Labor v. Insurance Co. of North America*, 131 F.3d 1037, 1043 n.11 (D.C. Cir. 1997). Whatever its application to ERISA plan documents may be, a rule devised as a tiebreaker is of no relevance when the language in question is clear.

\* \* \*

For the foregoing reasons, the judgment of the district court is

*Affirmed.*