# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 1, 2023        Decided April 5, 2024

No. 23-5065

NATIONAL ASSOCIATION OF REALTORS,
APPELLEE

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02406)

———

*Frederick Liu*, Attorney, U.S. Department of Justice, argued the cause for appellants. On the briefs were *Daniel E. Haar*, *Nickolai G. Levin*, and *Steven J. Mintz*, Attorneys.

*Christopher G. Michel* argued the cause for appellee. With him on the brief were *Michael D. Bonanno*, *William A. Burck*, and *Rachel G. Frank*.

*Andrew R. Varcoe*, *Djordje Petkoski*, and *Jacob Coate* were on the brief for *amicus curiae* Chamber of Commerce of the United States of America in support of appellee.

Before: HENDERSON, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

Dissenting opinion filed by *Circuit Judge* WALKER.

PAN, *Circuit Judge*.  The Antitrust Division of the United States Department of Justice ("DOJ") opened an investigation of potentially anticompetitive practices in the real-estate industry that were implemented by the National Association of Realtors ("NAR").  In November 2020, DOJ and NAR settled the case.  In addition to filing a Proposed Consent Judgment in the district court, DOJ sent a letter to NAR stating that DOJ had closed its investigation of certain NAR practices and that NAR was not required to respond to two outstanding investigative subpoenas.  Eight months later, in July 2021, DOJ exercised its option to withdraw the Proposed Consent Judgment, reopened its investigation of NAR's policies, and issued a new investigative subpoena.  NAR petitioned the district court to set aside the subpoena, arguing that its issuance violated a promise made by DOJ in the 2020 closing letter.  The district court granted NAR's petition, concluding that the new subpoena was barred by a validly executed settlement agreement.  We disagree.  In our view, the plain language of the disputed 2020 letter permits DOJ to reopen its investigation.  We therefore reverse the judgment of the district court.

## I.

NAR is a trade organization with 1.4 million members who work in the real-estate industry.  For decades, NAR has promulgated a "Code of Ethics," along with other related rules, which set policies that NAR members must follow when brokering real-estate transactions.

In 2018, DOJ's Antitrust Division opened a civil investigation into certain NAR policies, after receiving a

complaint from an industry participant. As part of the investigation, DOJ issued two subpoenas, or Civil Investigative Demands ("CIDs"),[1] seeking information and documents related to NAR's operation of "multiple-listing services" ("MLSs"). An MLS is an online, subscription-based database that lists properties that are on the market in a particular geographic area. Brokers representing sellers (or "listing brokers") post information about homes that are for sale on an MLS, where buyer-brokers can view that information. There are hundreds of MLSs operating in the United States, and some MLSs have tens of thousands of participants, comprised primarily of members of NAR's local associations and boards.

DOJ served its first CID — CID No. 29935 ("CID No. 1") — in April 2019. That CID sought information regarding various practices and procedures adopted by NAR, including a longstanding policy known as the "Participation Rule." Under the Participation Rule, which NAR first implemented in the 1970s, listing brokers must offer the same commission to all buyer-brokers when listing a property on an MLS. *See* NAR, *Handbook on Multiple Listing Policy* 34 (2018), https://perma.cc/AA7S-UFSB. According to DOJ, the Participation Rule restrains price competition among buyer-brokers and causes them to steer customers to higher-commission listings.

In June 2020, DOJ served its second CID — CID No. 30360 ("CID No. 2") — which sought information from NAR about a newly adopted rule called the "Clear Cooperation

---

[1] A CID is a type of administrative subpoena. *See FTC v. Ken Roberts Co.*, 276 F.3d 583, 585 (D.C. Cir. 2001). The Antitrust Civil Process Act authorizes DOJ to issue a CID whenever it "has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation." 15 U.S.C. § 1312(a).

Policy." That policy requires listing brokers to post a property on an MLS within one day of when they begin to market the property. *See* NAR, *Handbook on Multiple Listing Policy* 32 (2020), https://perma.cc/8BPG-UBGT. DOJ believes that the Clear Cooperation Policy restricts home-seller choices and precludes competition from new listing services.

NAR expressed its desire to settle the case. Thus, in July 2020, the parties began proposing "the outlines of a possible resolution." J.A. 243. During the negotiations, NAR asked DOJ to agree to refrain from investigating the Participation Rule for ten years.[2] DOJ refused, stating that "a commitment to not challenge NAR rules and policies in the future [was] a nonstarter, especially in light of longstanding Department policies concerning settlements that affect future potential investigations." *Id*. at 248. Thereafter, DOJ reiterated during the negotiations that it would not "commit to never challeng[ing] NAR rules and policies in the future in light of longstanding Department policies on such commitments." *Id*. at 252 (July 29, 2020, letter); *see also id*. at 258–59 (Aug. 12, 2020, letter).

The parties ultimately agreed to enter a Proposed Consent Judgment, which specifically addressed four NAR policies other than the Participation Rule and the Clear Cooperation Policy.[3] The Proposed Consent Judgment also included a

---

[2]     NAR requested that DOJ (1) "stipulate that NAR's Participation Rule would not be subject to further investigation any time in the next ten years"; and (2) "send a closing letter to NAR confirming that it has no obligation to provide additional information or documents in response to CID No. [1] or CID No. [2]." J.A. 247.

[3]     The policies addressed in the Proposed Consent Judgment were: (1) NAR's "Commission-Concealment Rules," under which affiliated brokers could conceal from homebuyers the unilateral

"Reservation of Rights" clause that generally preserved DOJ's ability to bring actions against NAR in the future. The Reservation of Rights clause provided that "[n]othing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards." J.A. 176. NAR agreed to that language, which was proposed by DOJ, but only on the condition that DOJ provide a "closing letter" concerning the then-pending investigation of the Participation Rule and the Clear Cooperation Policy. *Id*. at 126 ("NAR will only agree to sign a consent decree including this [Reservation of Rights] provision if DOJ provides written confirmation, prior to the execution of the decree, that it will issue a closing letter."). NAR asked that the closing letter confirm that DOJ closed the existing investigation and that NAR had no obligation to respond to the two outstanding CIDs. DOJ agreed, stating that it would send the requested closing letter "once the consent decree is filed." *Id*. at 128 (Oct. 28, 2020, email).

On November 19, 2020, the government did two things: (1) It filed the signed Proposed Consent Judgment in the district court, along with a Complaint and a "Stipulation and Order"; and (2) it sent the closing letter to NAR's counsel. None of the documents filed in court mentioned the Participation Rule or the Clear Cooperation Policy. DOJ's

---

blanket commission offered to buyer-brokers; (2) NAR's "Free-Service Rule," under which buyer-brokers were permitted to represent to homebuyers that their services were free; (3) NAR's "Commission-Filter Rules and Practices," under which brokers could filter properties on an MLS by the rate of commission; and (4) NAR's "Lockbox Policy," which prohibited non-NAR brokers from accessing the lockboxes that contain the keys to listed properties.

Complaint alleged that the four other NAR policies that were the subject of the Proposed Consent Judgment violated Section 1 of the Sherman Act, while the Proposed Consent Judgment contained settlement terms related to those four other policies. *See supra* note 3 (describing the NAR policies covered by the Proposed Consent Judgment). The Stipulation and Order stated that NAR would "abide and comply" with the Proposed Consent Judgment, pending the entry of a final judgment in the case by the district court. J.A. 148. It also provided that "[t]he United States may withdraw its consent at any time before the entry of the proposed Final Judgment." *Id*. at 147.

The closing letter sent to NAR's counsel ended the then-pending investigation of the Participation Rule and the Clear Cooperation Policy, stating:

> Dear Mr. Burck [NAR's counsel]:
>
> This letter is to inform you that the Antitrust Division has closed its investigation into [NAR's] Clear Cooperation Policy and Participation Rule. Accordingly, NAR will have no obligation to respond to CID Nos. 29935 and 30360 issued on April 12, 2019 and June 29, 2020, respectively.
>
> No inference should be drawn, however, from the Division's decision to close its investigation into these rules, policies or practices not addressed by the consent decree.
>
> Sincerely,
>
> /s/ Makan Delrahim [Assistant Attorney General, Antitrust Division]

J.A. 178.

DOJ published the Complaint, the Proposed Consent Judgment, and a Competitive Impact Statement in the Federal Register, as mandated by the Tunney Act. *See United States v. National Association of REALTORS® Proposed Final Judgment and Competitive Impact Statement*, 85 Fed. Reg. 81,489 (Dec. 16, 2020); 15 U.S.C. § 16(b). The Competitive Impact Statement included a "description of events" giving rise to the allegations in the Complaint, and explained the parties' Proposed Consent Judgment, the remedies available to potential private litigants, the procedures available to modify the negotiated terms, alternatives to settlement that the government considered, and the standard of review governing the court's approval of the Proposed Consent Judgment. *See* J.A. 179–200. The Tunney Act requires that the United States "receive and consider any written comments" pertaining to the published materials during a mandatory 60-day period. 15 U.S.C. § 16(d). Thereafter, the district court must determine whether the proposed consent judgment is in the "public interest" before issuing a final judgment. *Id*. § 16(e).

In July 2021, after an unsuccessful negotiation to modify the parties' settlement agreement, DOJ exercised its option to withdraw the Proposed Consent Judgment. The government voluntarily dismissed the Complaint and filed a notice informing the district court of the withdrawal of its consent. Five days later, DOJ issued a new subpoena — CID No. 30729 ("CID No. 3") — which requested information from NAR regarding the Participation Rule and the Clear Cooperation Policy, as well as several policies addressed in the withdrawn Proposed Consent Judgment.

NAR petitioned the district court to set aside CID No. 3, arguing that its issuance contravened the parties' binding

settlement agreement, which included DOJ's promise in the November 2020 closing letter to close its investigation of the Participation Rule and the Clear Cooperation Policy. Specifically, NAR argued that it had satisfied its obligations under the settlement agreement by beginning to perform the requirements of the Proposed Consent Judgment, and that DOJ breached the overall agreement by issuing CID No. 3 in contravention of the closing letter. The district court granted NAR's petition, agreeing with NAR that CID No. 3 was barred by "a validly executed settlement agreement." *Nat'l Ass'n of Realtors v. United States*, 2023 WL 387572, at *3 (D.D.C. Jan. 25, 2023). The court concluded that the parties' settlement agreement included the November 2020 closing letter; and that "the government breached the agreement by reopening the investigation into those same rules and serving the new CID." *Id.* at *4.[4] DOJ timely appealed. We have jurisdiction under 15 U.S.C. § 1314(e) and 28 U.S.C. § 1291.

**II.**

The Antitrust Civil Process Act ("ACPA") authorizes courts to "set[] aside" a CID based on "any failure of such demand to comply with the provisions of [the ACPA], or upon any constitutional or other legal right or privilege." 15 U.S.C. § 1314(b). The parties agree that a CID is unenforceable if it is barred by a valid settlement agreement. *See* NAR Br. 18; DOJ Br. 28. The party served with a CID bears the burden of

---

[4]    NAR also petitioned the district court to modify CID No. 3 because it "ma[de] demands that are overly broad, unduly burdensome, and irrelevant to any permissible investigation." J.A. 15. The district court declined to address NAR's breadth and burdensomeness objections because it set aside the CID in full. Because the district court did not rule on NAR's request for modification, we decline to reach the issue.

demonstrating that it should be set aside. *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991).

A settlement agreement is a contract. *See Vill. of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C. Cir. 1982). The "[i]nterpretation of the plain language of a contract is a question of law subject to de novo review by this court." *LTV Corp. v. Gulf States Steel, Inc. of Ala.*, 969 F.2d 1050, 1055 (D.C. Cir. 1992); *see also Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014) (de novo review for the question of whether a contract is ambiguous). We give deference, however, to the district court's factual findings if they are at issue on appeal. *See United States v. Microsoft Corp.*, 147 F.3d 935, 945 n.7 (D.C. Cir. 1998). In determining the meaning of federal contracts, we apply "federal common law," which looks to the Restatement of Contracts. *United States v. Honeywell Int'l Inc.*, 47 F.4th 805, 816 (D.C. Cir. 2022); *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 n.6 (D.C. Cir. 2001).

The district court determined that the Proposed Consent Judgment and the closing letter were components of a single, binding settlement agreement. *See Nat'l Ass'n of Realtors*, 2023 WL 387572, at *4. The parties have not meaningfully briefed the potential unenforceability of the closing letter due to the withdrawal of the Proposed Consent Judgment, and both parties agree that "[t]he key question is . . . whether DOJ's promise [in the closing letter] to close the investigation and rescind the CIDs left it free to resume the investigation and reissue the CIDs based solely on its preference to do so." NAR Br. 14; *see also* Oral Arg. Tr. at 3:13–16, Nat'l Ass'n of Realtors v. United States (No. 23-5065) (counsel for the government stating that "[t]he question is whether in addition to agreeing to close its investigation the Division made a commitment not to reopen it. The answer is no.").

10

We therefore accept the parties' apparent assumption that the closing letter is a binding agreement that remains enforceable, notwithstanding the withdrawal of the Proposed Consent Judgment. *See, e.g*, NAR Br. 43 n.11; Oral Arg. Tr. at 11:16–12:6. We adopt the framing of the dispute that is advanced by the parties because "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). In other words, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008).[5]

---

[5] Nevertheless, we observe that the closing letter likely became unenforceable when the Proposed Consent Judgment was lawfully withdrawn because both documents were essential parts of the parties' settlement agreement: NAR agreed to enter the Proposed Consent Judgment on the condition that DOJ issue the closing letter, J.A. 126; and NAR contends that the terms of the closing letter are in effect because it had begun performing its obligations under the Proposed Consent Judgment "in reliance on the terms of the settlement," NAR Br. 8 (citing J.A. 23–24). The closing letter and Proposed Consent Judgment thus do not appear to be severable. *See Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 85 (D.C. Cir. 2005) (holding that an unenforceable term is severable from an agreement if it is "not [] essential to a contract's consideration" (citing *Restatement (Second) of Contract*s § 184 (Am. L. Inst. 1981)) (additional citations omitted)). Moreover, we note that the closing letter, viewed on its own, appears to be a unilateral promise unsupported by consideration or partial performance, which typically would be unenforceable as a matter of contract law. *See Restatement (Second) of Contracts* § 71 (Am. L. Inst. 1981) ("To constitute consideration, a performance or a return promise must be bargained for.").

11

## III.

As framed by the parties, the issue before us is narrow. DOJ argues only that the plain language of the closing letter does not bar it from reopening its investigation and issuing a new CID regarding the Participation Rule and the Clear Cooperation Policy. We agree.

## A.

"Under general contract law, the plain and unambiguous meaning of an instrument is controlling." *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960–61 (D.C. Cir. 1980). Thus, if the text of the closing letter is unambiguous, "that is the end of the matter" and we need not address the parties' negotiation history or any other extrinsic evidence. *Brubaker v. Metro. Life Ins. Co.*, 482 F.3d 586, 590 (D.C. Cir. 2007); *Iberdrola Renewables, Inc. v. FERC*, 597 F.3d 1299, 1304 (D.C. Cir. 2010).

The disputed language of the closing letter states:

> [T]he Antitrust Division has closed its investigation into [NAR's] Clear Cooperation Policy and Participation Rule. Accordingly, NAR will have no obligation to respond to CID Nos. 29935 and 30360 issued on April 12, 2019 and June 29, 2020, respectively.

J.A. 178.

The plain meaning of that provision is that DOJ closed its then-pending investigation and relieved NAR of its obligation to respond to two specifically identified CIDs. We discern no commitment by DOJ — express or implied — to refrain from either opening a new investigation or reopening its closed

investigation, which might entail issuing new CIDs related to NAR's policies. Put simply, the fact that DOJ "closed its investigation" does not guarantee that the investigation would stay closed forever. The words "close" and "reopen" are unambiguously compatible. *See Close*, Merriam-Webster Dictionary ("to bring to an end or period"); *Reopen*, Merriam-Webster Dictionary (legal definition) ("to resume the discussion or consideration of (a *closed* matter)" (emphasis added)). Thus, DOJ's decision to "reopen" the investigation and to issue CID No. 3 was consistent with the closing letter's "plainly expressed intent." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (cleaned up).

Our interpretation of the operative language is supported by another provision in the closing letter, as well as an interpretive canon of construction. First, DOJ included a "no inference" clause in the closing letter, which states that "[n]o inference should be drawn . . . from the Division's decision to close its investigation into these rules, policies or practices not addressed by the consent decree." J.A. 178. That clause confirms that DOJ did not intend to imply any additional terms in the letter, such as one prohibiting a reopened investigation. Second, the unmistakability principle, a canon of construction, instructs that "a contract with a sovereign government [should] not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act . . . , nor [should] an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power." *United States v. Winstar Corp*., 518 U.S. 839, 878 (1996) (plurality op.). In other words, we will not interpret a contract to cede a sovereign right of the United States unless the government waives that right unmistakably. The closing letter contains no "unmistakable term" ceding DOJ's power to reopen its investigation: To the contrary, it includes a "no inference clause" that explicitly disclaims any

intent to include unstated terms.  We therefore decline to read an unwritten term into the agreement that limits the government's prosecutorial authority.  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982).[6]

We note that NAR should not have been misled by the words used in the closing letter because investigations are routinely "closed" and then later "reopened."  For example, in *Schellenbach v. SEC*, the National Association of Securities Dealers ("NASD"), a self-regulatory organization, "reopen[ed]" a securities-law investigation after initially issuing a letter "signaling the end of [its] investigation." 989 F.2d 907, 909–11 (7th Cir. 1993).  The Seventh Circuit held that "even if the . . . letter signaled that the NASD had closed its investigation of [the petitioner], the NASD was perfectly free to reconsider the matter."  *Id.* at 911.  In fact, the court found no "support [for] the proposition that the NASD may not reopen [the] investigation" following the issuance of the closing letter.  *Id*.  Although NAR distinguishes *Schellenbach* by arguing that the letter in that case was not part of a contract,

---

[6]  Although the government did not raise the unmistakability principle before the district court, that principle cannot be forfeited because it is a "canon of contract construction." *Winstar*, 518 U.S. at 860.  We can consider "interpretive canons" even if a party "intentionally left them out of [its] brief." *Guedes v. BATFE*, 920 F.3d 1, 22 (D.C. Cir. 2019) (per curiam).  But even if the doctrine were forfeitable, it was not forfeited here because NAR itself put the doctrine at issue before the district court in citing an Office of Legal Counsel opinion discussing *Winstar* and the rule against waiver of sovereign power. *See* Resp. to the Gov't's Opp. to NAR's Pet. 3, *Nat'l Ass'n of Realtors v. United States*, Civ. No. 21-02406 (D.D.C. Nov. 12, 2021), ECF No. 21-2 (citing *Auth. of the U.S. to Enter Settlements Limiting the Future Exercise of Exec. Branch Discretion*, 23 Op. OLC 126 (June 15, 1999)).  NAR therefore cannot claim to be surprised by our consideration of the unmistakability principle.

that fact does not cast doubt on our conclusion that the plain meaning of the word "close" does not preclude DOJ from "reopening" its investigation.

Investigations initiated by the government are no different. For example, in *Marinello v. United States*, the Supreme Court noted that between 2004 and 2009, the IRS "opened, then closed, then reopened an investigation into the tax activities of Carlo Marinello." 138 S. Ct. 1101, 1105 (2018). And in *J. Roderick MacArthur Foundation v. FBI*, we emphasized that the FBI had an interest in retaining certain intelligence it had gathered because "information that was once collected as part of a now-closed investigation may yet play a role in a new or reopened investigation." 102 F.3d 600, 604 (D.C. Cir. 1996); *see also Senate of the Commonwealth of P.R. on Behalf of Judiciary Comm. v. DOJ*, 823 F.2d 574, 586 (D.C. Cir. 1987) (noting that a "DOJ investigation . . . was closed officially on April 16, 1980, and did not reopen until August 1983").

In sum, the closing letter unambiguously permits DOJ to reopen its investigation of the Participation Rule and the Clear Cooperation Policy. Our interpretation is supported by the letter's plain language, its inclusion of the "no-inference" clause, and our application of the unmistakability principle.

**B.**

NAR's counterarguments do not persuade us. As a textual matter, NAR argues that we should adopt the district court's reasoning that, in plain English, "[o]pening an investigation is the opposite of closing one." *Nat'l Ass'n of Realtors*, 2023 WL 387572, at \*4. Based on that logic, the district court held that reopening the investigation of the disputed policies violated DOJ's promise to close it. *See id*. As discussed above, the words "close" and "reopen" are not mutually exclusive, and we reject NAR's argument that the closing letter imposed any

future obligation on DOJ. Rather, the letter stated only that "NAR will have no obligation to respond" to the CIDs identified in the closing letter — namely, "CID Nos. 29935 and 30360 issued on April 12, 2019 and June 29, 2020, respectively." J.A. 178.

NAR also analogizes the closing letter to a parent instructing a child to "close the door when you leave for school," arguing that the parent "would surely feel misunderstood if the child closed the door and then immediately reopened it before departing for the day." NAR Br. 22 (citing *Biden v. Nebraska*, 143 S. Ct. 2355, 2376–82 (2023) (Barrett, J., concurring)). But a hypothetical parent instructing a child to "close the door when you leave for school" does not intend that the child never open the door again, and the approximately eight months that elapsed between the issuance of the closing letter and the reopening of the investigation do not factually support a claim of an "immediate" reopening.

Next, NAR urges us to consider extrinsic evidence to support its interpretation of the closing letter. Specifically, NAR relies on the parties' negotiating history, DOJ's "course of performance," and NAR's own priorities and incentives to support its argument that DOJ agreed not to "reopen" the investigation of the Participation Rule and Clear Cooperation Policy. Those arguments have no traction because, as we have discussed, we do not consider extrinsic evidence where the plain text of an agreement is unambiguous. *See NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985) ("Only if the court determines as a matter of law that the agreement is ambiguous will it look to extrinsic evidence of intent to guide the interpretive process."); *Iberdrola*, 597 F.3d at 1304. In any event, NAR's extrinsic evidence is unconvincing.

First, NAR asserts that the parties' agreement to omit any mention of the Participation Rule and Clear Cooperation Policy in the Proposed Consent Judgment "make[s] clear that DOJ's promise in the Closing Letter was a deliberate carveout from the reservation-of-rights provision in the consent decree." NAR Br. 25. But the text of the Reservation of Rights clause supports DOJ's position that it retained the right to investigate the Participation Rule and the Clear Cooperation Policy: The clause generally preserves the government's authority to investigate and bring actions "concerning *any* Rule or practice adopted or enforced by NAR or any of its Member Boards." J.A. 176 (emphasis added). Moreover, during the parties' negotiations, DOJ explicitly declined to accept any agreement that constrained future investigations — and did so on three separate occasions.[7] Thus, the negotiating history of the Reservation of Rights provision is inconclusive.

Second, NAR contends that DOJ's "course of performance" — *i.e.*, its eventual withdrawal of the Proposed Consent Judgment — demonstrates that DOJ "understood that the Closing Letter 'prevented' it from investigating NAR's Participation Rule and Clear Cooperation Policy." NAR

---

[7]   First, when NAR requested that DOJ "stipulate that NAR's Participation Rule would not be subject to further investigation any time in the next ten years," J.A. 247, DOJ responded that any "commitment to not challenge NAR rules and policies in the future," was "a nonstarter." *Id*. at 248. Second, when NAR proposed that "any changes to the Participation Rule and/or the Clear Cooperation Policy . . . will completely address all of the Division's concerns and that the Division will close its investigation," *id*. at 251, DOJ again responded that "we cannot commit to never challenge NAR rules and policies in the future." *Id*. at 252. And third, when DOJ agreed to send NAR a closing letter, it reiterated that "the Division cannot commit to never investigating or challenging NAR's rules and policies in the future." *Id*. at 259.

Br. 28. According to NAR, DOJ withdrew the Proposed Consent Judgment because it wished to reopen its investigation of those policies but recognized that it could not do so without modifying the overall settlement agreement. But we decline to allow NAR to take contradictory positions with respect to the relationship between the Proposed Consent Judgment and the closing letter. NAR may not implicitly assume that these are separate agreements such that the closing letter remained enforceable despite the withdrawal of the Proposed Consent Judgment, *see supra* note 5, while also arguing that the two documents were part of the same settlement agreement for purposes of interpreting the meaning of the closing letter. "Simply put, [NAR] cannot have it both ways." *See United States v. Philip Morris USA Inc*., 840 F.3d 844, 853 (D.C. Cir. 2016) (rejecting defendant's contradictory positions about the effect of a district court order); *Nat'l Ass'n of Crim. Def. Laws., Inc. v. DOJ*, 182 F.3d 981, 985 (D.C. Cir. 1999) (noting that "a party may not blow hot and cold" in taking inconsistent positions).

Lastly, NAR argues that it would not have agreed to the Proposed Consent Judgment without a commitment from DOJ not to investigate the Participation Rule and the Clear Cooperation Policy in the future. According to NAR, without such a commitment, "the agreement contemplated only a letter worth nothing but the paper on which it was written." NAR Br. 24 (quoting *Nat'l Ass'n of Realtors*, 2023 WL 387572, at *4). We disagree. Contrary to NAR's contention, NAR gained several benefits from the closing of DOJ's pending investigation in 2020. Most obviously, NAR was relieved of its obligation to respond to the two outstanding CIDs, which required the production of substantial information. Moreover, NAR gained some value from the possibility that DOJ would not reopen its investigation at all, or for a substantial period of time. In addition, NAR avoided the risk that its responsive

documents would be publicized in conjunction with a potential future complaint filed by DOJ.

Significantly, NAR also used the closing letter to its advantage in other, private litigation that was pending when the closing letter was negotiated and issued. Plaintiffs in the private litigation asserted claims under the Sherman Act and California's Cartwright Act, stemming from NAR's adoption of the Clear Cooperation Policy. *See PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831 (9th Cir. 2022). One day after DOJ issued the closing letter, NAR submitted the letter to the court presiding over the private litigation as evidence that DOJ was no longer investigating NAR's policy. *See* NAR's Response to Plaintiff's Notice of Supplemental Authority at Ex. B, *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 516 F. Supp. 3d 1047 (C.D. Cal. 2021) (Case No. 2:20-cv-04790), ECF No. 88 (filed on Nov. 20, 2020). NAR's filing asserted that "for the Clear Cooperation Policy at issue in [the private litigation], on the same day it commenced the Tunney Act proceedings, the Department of Justice sent NAR a closing letter, attached hereto as Exhibit B, . . . 'clos[ing] its investigation into the . . . Clear Cooperation Policy and Participation Rule.'" *Id.* at 1 (quoting J.A. 178). NAR thus used the closing letter to bolster its litigating position in the private lawsuit, thereby plainly benefitting from the letter's issuance.

## C.

We agree with our dissenting colleague that DOJ promised to "close" its investigation of the Participation Rule and Clear Cooperation Policy, in exchange for NAR's concessions regarding four other policies, embodied in the Proposed Consent Judgment. *See* Dissenting Op. at 1–2. But the dissent goes on to assert that it would be a violation of the settlement agreement if DOJ "*immediately*" reopened the investigation it

had agreed to close, while NAR was still bound by the contract. *Id*. at 1 (emphasis in original); *see also id*. at 5 n.7 ("So as DOJ sees things, it had the right to reopen the investigation (immediately) even if the contract remained in force."). We take no position on the hypothetical situation addressed by the dissent. In the case before us, DOJ exercised its option to withdraw the Proposed Consent Judgment, thereby releasing NAR from its obligations under the agreement; only then did DOJ reopen its investigation and issue a new CID for information related to the Participation Rule and Clear Cooperation Policy — and that reopening occurred eight months after the original settlement agreement was reached. Because the reopening was not "immediate" and there was never a time when NAR was bound by the settlement agreement while DOJ was not, the dissent's analysis is inapposite.[8]

---

[8] As we have noted, *supra* pp. 9–10 & n.5, we confined our opinion to the meaning of the closing letter, as the parties asked us to do. The dissent, however, interprets the overall settlement agreement, including the *quid pro quo* in which NAR signed the Proposed Consent Judgment in exchange for DOJ's issuance of the closing letter. *See generally* Dissenting Op. As we explained, *supra* note 5, consideration of the overall agreement would likely lead to the conclusion that DOJ's withdrawal from the Proposed Consent Judgment had the effect of canceling the entire deal — *i.e.*, the closing letter would not be enforceable if the Proposed Consent Judgment were withdrawn because the two components of the agreement are not severable. DOJ, however, chose not to rely on that argument, and instead asked us to interpret the language in the closing letter as if it were enforceable. *See supra* pp. 9–10 & n.5; Oral Arg. Tr. at 11. The dissent apparently misunderstands DOJ's position — it transforms DOJ's decision not to argue that both parts of the deal were canceled into a concession that the court may interpret the overall settlement agreement while ignoring DOJ's withdrawal from the Proposed Consent Judgment. *See* Dissenting

The dissent contends that DOJ "unilaterally reneged" on the settlement agreement, and states that "[for] purposes of this appeal, it doesn't matter that DOJ withdrew the consent decree when it reopened the investigation." Dissenting Op. at 3 & n.5. Those statements overlook that NAR agreed to the term of the settlement agreement that gave DOJ the unfettered right to withdraw its consent at any time. *See* J.A. 147. When DOJ exercised that option, it put the parties back to where they were before they entered the settlement — *i.e.*, it restored the status quo ante. Thus, DOJ did nothing nefarious or underhanded when it withdrew from the settlement, as NAR had agreed it could do.

Finally, we cannot agree with the dissent that "the sole question [in this appeal] is whether DOJ is correct that it could have immediately reopened its investigation of the Realtors' two remaining policies after contracting to close that investigation." Dissenting Op. at 4. As the dissent acknowledges, the facts before us do not demonstrate an "immediate" reopening of the investigation after it was closed. *See id*. at 3 (stating that "about eight months after contracting to close its investigation into the two remaining policies, DOJ reopened the investigation"). We therefore have no occasion to consider that scenario and we decline to opine on whether such conduct by DOJ would constitute a breach of the agreement.

---

Op. at 5 n.7 ("DOJ disavowed the argument that its unilateral withdrawal had anything to do with this case."); *id*. ("So as DOJ sees things, it had the right to reopen the investigation (immediately) even if the contract remained in force.").

21

\*   \*   \*

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

*So ordered.*

WALKER, *Circuit Judge*, dissenting: The National Association of Realtors made a contract with the Antitrust Division of the Department of Justice. As in every contract, each side gained something, and each side gave something up. The Realtors agreed to give up four policies that DOJ considered anticompetitive. In exchange, DOJ promised that it had "closed" its investigation into two other policies.

DOJ doesn't deny that it made a contract. Nor is there any dispute about what it gained. Instead, the sole question is — what did DOJ give up when it "closed" the investigation?

Nothing, if we believe DOJ. As it sees things, it could *immediately* reopen its investigation because anything "closed" can be reopened at any time.

No court identified by DOJ has endorsed such a reading. Nor should we. Because DOJ misreads one isolated word ("closed") to nullify what the Realtors gained from an otherwise comprehensive and comprehensible contract, I respectfully dissent.

## I

In 2019, the Antitrust Division of the Department of Justice opened a civil investigation into the National Association of Realtors' policies. In 2020, several months into the investigation, each side came to the bargaining table. DOJ identified six policies that it wanted changed. The Realtors expressed a willingness to change four of them. But the Realtors repeatedly insisted that they would "not agree" to change those four policies "without prior written assurances" that DOJ "has closed its investigation" into the other two. JA 109 (Realtors expressing these demands via email to DOJ); *see*

*also* JA 126 (Realtors attaching these demands to DOJ's draft reservation of rights provision).[1]

Eventually, DOJ decided that securing changes to the four anticompetitive policies outweighed the risks of bringing a lawsuit that might change *none* if DOJ took the case to court and lost.[2]  So DOJ finally acquiesced to the Realtors' demand. And with that, they had a deal.

The parties captured their deal in a settlement agreement. The agreement detailed the extensive changes the Realtors would need to immediately undertake.  JA 165-74.[3]  As for DOJ's promise to close, one page of the agreement stated:

> **[T]he Antitrust Division has closed its investigation into the [two remaining policies]. Accordingly, [the Realtors] will have no obligation to respond to [two Civil Investigative Demands regarding those two remaining policies].**

---

[1] When describing what happened in 2019 and 2020, I will refer to the government as "DOJ" or "the Antitrust Division of the Department of Justice," rather than DOJ's preferred nomenclature: "the previous leadership of the Division."  DOJ Br. at 11.

[2] *Cf. United States v. United States Sugar Corp.*, 73 F.4th 197 (3d Cir. 2023) (failed DOJ civil antitrust suit); *United States v. UnitedHealth Group Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022) (same); *United States v. Booz Allen Hamilton Inc.*, No. CCB-22-1603, 2022 WL 16553230 (D. Md. Oct. 31, 2022) (same).

[3] This portion of the settlement agreement is called the "consent decree."

JA 178 (emphasis added).[4]

With that agreement in place, the Realtors immediately began to comply. But unexpectedly, DOJ later insisted on modifying the agreement. When the Realtors refused, DOJ unilaterally reneged. In July 2021, about eight months after contracting to close its investigation into the two remaining policies, DOJ reopened the investigation.[5]

The Realtors sued, arguing that the reopened investigation is not what they bargained for. *National Association of Realtors v. United States*, No. 21-2406, 2023 WL 387572, at *2 (D.D.C. Jan. 25, 2023). The district court agreed with the Realtors. It explained that the "government, like any party, must be held to the terms of its settlement agreements." *Id.* at *5; *cf. United States v. Lee*, 106 U.S. 196, 220 (1882) ("No man in this country is so high that he is above the law."). It also noted that "the government itself understood the broader settlement to require closure of the investigation" — a "common-sense interpretation of the parties' settlement" that DOJ does not dispute. *National Association of Realtors,* 2023 WL 387572, at *4. So, as the district court said, "it is not hard

---

[4] This portion of the settlement agreement is called the "closing letter."

[5] For the purposes of this appeal, it doesn't matter that DOJ withdrew the consent decree when it reopened the investigation. *See* Maj. Op. at 16-17 (rejecting course of performance arguments in this case). That's because the contract's meaning depends on what it unambiguously says, not on what happened eight months after its formation. And as DOJ repeatedly insists, the meaning of "closed" *at the time of contract formation* is the sole issue before the Court. *See infra* n.6.

4

to conclude that the new [reopening] violates the agreement."
*Id.*

DOJ appealed.

## II

The question presented is not whether DOJ's promise to close an investigation means the investigation must stay closed forever. Nor is the question whether DOJ can reopen an investigation eight months after it contracts to close it, as DOJ did here. Rather, the sole question is whether DOJ is correct that it could have immediately reopened its investigation of the Realtors' two remaining policies after contracting to close that investigation.[6]

---

[6] DOJ readily admits that this is its one and only argument. *See* Oral Arg. Tr. at 4 (Question: "If we disagree with you about [the meaning of closed], do you have another theory where you can win; or do you concede that's the case?" DOJ: "That is our theory in this Court which is that when the Antitrust Division made the commitment to close, that did not apply any additional commitment to refrain from reopening, and that's clear throughout the record."); *id.* at 8 (Question: "[D]o you have any concern that what DOJ is doing here will make it harder for future DOJs to convince parties in [the Realtors'] shoes that when DOJ says it will close an investigation, it will stay closed for more than a half minute?" DOJ: "No, because we made clear throughout the process that we weren't making that commitment."); *id.* at 12 (Question: "So, you're just relying on your interpretation of the closing letter[?]" DOJ: "Correct. Correct."); *see also* DOJ Reply Br. at 8 (arguing that DOJ is permitted to reopen investigations "at any time").

Because DOJ's sole argument is wrong, I would affirm the district court on the narrow grounds presented to us by DOJ's appeal.[7]

---

[7] Some readers may wonder, "Should DOJ lose just because their only argument is unpersuasive?" Yes. "But shouldn't they win if we can come up with a winning argument for them?" Not usually, and not here. "We adopt the framing of the dispute that is advanced by the parties because 'in our adversarial system of adjudication, we follow the principle of party presentation.'" Maj. Op. at 10 (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)) (cleaned up).

Here's what that means: DOJ disavowed the argument that its unilateral withdrawal had anything to do with this case. Oral Arg. Tr. at 11 (Question: "And it seems to me that there is a plausible argument that this closing letter, if it's part of an overall agreement that included the consent decree, was withdrawn when the consent decree was withdrawn. Are you not making that argument?" DOJ: "We're not pressing that argument as a standalone argument here . . . ."). So any arguments about unilateral withdrawals don't matter — even if they might otherwise have been winning ones. *See* Maj. Op. at 9 ("The parties have not meaningfully briefed the potential unenforceability of the closing letter due to the withdrawal of the Proposed Consent Judgment . . . ."). *But see id.* at 19 ("In the case before us, DOJ exercised its option to withdraw the Proposed Consent Judgment, thereby releasing [the Realtors] from [their] obligations under the agreement . . . eight months after the original settlement agreement was reached. Because the reopening was not 'immediate' and there was never a time when [the Realtors were] bound by the settlement agreement while DOJ was not, the dissent's analysis is inapposite.").

So as DOJ sees things, it had the right to reopen the investigation (immediately) even if the contract remained in force. That is the *only* argument DOJ made on appeal. *See supra* n.6. And if that argument isn't a winner, DOJ's appeal can't be a winner. *But see* Maj. Op. at 20 ("Finally, we cannot agree with the dissent that 'the sole question [in this appeal] is whether DOJ is correct that it could have

6

**A**

Let's start with some common ground.  DOJ says "closed" and "reopen" are not mutually exclusive.  And sometimes that's true.  In the abstract, a promise to close something does not always include a promise to keep it closed forever.

But this abstract understanding of "closed" and "reopen" is only the starting point of our analysis.  That's because "context matters." *Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 414 (2012).  And depending on the context, a promise to close something might mean the closer cannot immediately reopen it.  *See* Oral Arg. Tr. at 6 (DOJ: "context is critical").

A hypothetical presented by the Realtors illustrates the point.  Consider the following:

> **A parent tells a child,**
> **"Close the door."**

Without context, we can't know *when* the child may reopen the door.  Read literally, the child may close the door and then immediately reopen it.  But a "good textualist is not a literalist." *See* Antonin Scalia, A Matter of Interpretation 24 (1997).  So to know more, we need context.

Now imagine:

> **A parent says,**
> **"Close the door when you leave for school."**

---

immediately reopened its investigation of the Realtors' two remaining policies after contracting to close that investigation.'").

In that case, even if DOJ's literalist reading works in the abstract, it fails to capture the command's true meaning. Perhaps Dennis the Menace would close the door and then immediately reopen it before he runs toward the school bus and mockingly calls back, "You didn't say to *keep* it closed!" But an obedient child would not.

We encounter situations like this all the time, both in life and the law. Consider the following:

> **A gate agent tells a late passenger,**
> **"Sorry, I've closed the jet bridge."**

> **A sign on a barricade says,**
> **"Road Closed."**

The late passenger understands that the gate agent means, "I've closed the jet bridge and I won't reopen it for your flight." And if the "Road Closed" sign is on Glacier Park's Going-to-the-Sun Road in December, the sign means the road ahead is closed for the rest of the season. As these examples illustrate, "ultimately, context determines meaning." *Caraco*, 566 U.S. at 413-14 (cleaned up); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("To strip a word from its context is to strip that word of its meaning.").

So to sum up, I accept DOJ's abstract contention that "closed" and "reopen" are sometimes compatible. But because "context may drive such a statement in either direction," a promise to close something may at times preclude an immediate reopening. *Pulsifer v. United States*, 601 U.S. at __ (2024) (slip op. at 12 n.5). "Really, it all depends." *Id*. at __ (slip op. at 15).

**B**

By context, I mean the rest of the contract's text. And here, the text suggests a quid-pro-quo bargain that precludes DOJ's sole argument.[8]

Start with the terms of the quid pro quo. The *quid* was DOJ's closure of its investigation into the two remaining policies, promised in the one-page "closing letter" portion of the contract. The *quo* was the Realtors' surrender of the four anticompetitive policies. That surrender was described in painstaking detail across 15 pages. For example, the agreement required the Realtors to immediately "undertake certain actions and refrain from certain conduct for the purpose of remedying the anticompetitive effects" of the four policies. JA 162. The agreement then listed the Realtors' "prohibited conduct," "required conduct," "antitrust compliance," and requirements for "compliance inspection." JA 165-74 (cleaned up).

Read together, it's apparent from the four corners of the contract that the Realtors' extensive commitments about the four anticompetitive policies came at a cost to DOJ, and this

---

[8] I do not rely on extrinsic evidence outside the contract's four corners because "closed" is unambiguous when read in context. *See Iberdrola Renewables, Inc. v. FERC*, 597 F.3d 1299, 1304 (D.C. Cir. 2010) ("If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation.") (quoting *Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C. Cir. 1985)). In any event, the extrinsic evidence is something of a wash. DOJ said it would never promise what the Realtors wanted, and the Realtors said they would never settle without that promise — so the extrinsic evidence just tells us that someone was bluffing. *See* Maj. Op. at 4-5, 15-18.

bargained-for cost is the context that must inform the meaning of "closed."[9]

So when properly read in the context of the entire comprehensive agreement, DOJ's promise to close is best understood to mean:

**DOJ has closed its investigation into two remaining policies *in exchange for* the Realtors' promise to change four anticompetitive policies.**

I again emphasize "in exchange for" — the *pro* in quid pro quo — because the nature of the parties' exchange is what moves us beyond abstract propositions like "[t]he words 'close' and 'reopen' are unambiguously compatible." Maj. Op. at 12. When construing one side's promise in a quid pro quo, we "avoid constructions of contracts that would render promises illusory." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015). And here, that fundamental and well-settled contract principle means we must construe "closed" to preclude "immediately reopen." *See, e.g.*, *Irwin v. United States*, 57 U.S. 513, 519 (1853) (our "court can make no new contract for the parties").

This reading is also entirely logical. In any bargain, you give up something in order to get *something* in return. That's what separates a contract from a commandment, and a compromise from a ukase. *See Appalachian Power Co. v.*

---

[9] Recall that none of the following contextual points are disputed: The settlement agreement is a binding contract. Maj. Op. at 9. The contract includes DOJ's letter promising to close its investigation into the two remaining policies. *Id.* And DOJ's promise to close the investigation was in exchange for the Realtors' promise to change the four anticompetitive policies. *Id.* at 5-6.

*EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (a provision "reads like a ukase" because it "commands," "requires," "orders," and "dictates"). So both sides of the exchange in this agreement must have real meaning.

Under the Realtors' reading, both do: The Realtors gave up something (the four anticompetitive policies) to get something (non-illusory relief from DOJ's investigation into the two remaining policies). In contrast, DOJ's reading invests one side of the exchange with no real meaning at all. It says that the Realtors gave up something (a lot, actually) in exchange for nothing more than a promise by DOJ to close an investigation it could immediately reopen — in other words, for a promise "worth nothing but the paper on which it was written." *National Association of Realtors v. United States*, No. 21-2406, 2023 WL 387572, at *4 (D.D.C. Jan. 25, 2023).

## C

Several counterarguments were made in DOJ's brief and by its exceptionally able counsel at oral argument. But none can change this bottom line: DOJ needs you to believe that the Realtors gave away something for nothing.

First, DOJ says the Realtors actually did benefit from DOJ closing the investigation, including from the inertia that kept it closed for eight months. Sure, but DOJ isn't arguing for an eight-month rule; rather, it argues that it can reopen a closed investigation immediately. The Realtors would have received no benefit from *that*. So DOJ's theory still depends on reading its promise as meaningless — a reading prohibited by basic contract principles. *See M & G Polymers USA*, 574 U.S. at 440; *Irwin*, 57 U.S. at 519.

Second, DOJ cites other cases where the government reopened investigations that it previously closed. *See* Maj. Op. at 13-14. But DOJ has not cited a single precedent allowing it to reopen an investigation after contracting to close it in exchange for consideration. It relies instead on immaterial precedents about unilateral promises, not binding contracts. *See Marinello v. United States*, 584 U.S. 1 (2018) (describing no settlement negotiations whatsoever); *J. Roderick MacArthur Foundation v. FBI*, 102 F.3d 600 (D.C. Cir. 1996) (same); *Schellenbach v. SEC*, 989 F.2d 907, 910 (7th Cir. 1993) ("Petitioner and NASD officials discussed a settlement, but they could not agree").[10]

Third, DOJ cites the "unmistakability" principle. It disfavors interpretations that "cede a sovereign right of the United States unless the government waives that right unmistakably." Maj. Op. at 12. But that principle doesn't apply here where DOJ did unmistakably cede its right to immediately reopen its investigation into the two remaining policies — for the reasons explained above.

Finally, DOJ points to a sentence in one part of the settlement agreement that states: "No inference should be drawn" from DOJ's "decision to close its investigation into these rules, policies or practices not addressed by the consent decree." JA 178.[11]

---

[10] *See also* Oral Arg. Tr. at 29 (Question: "[C]an you point me to a precedent where the Government has made a promise in exchange for consideration to close an investigation and the Court has said that the Government can reopen the investigation?" DOJ: "Not in a case where we made a promise to do it . . . .").

[11] Recall that the consent decree described the Realtors' contractual obligations.

That sentence provides no answer to the one question in this case: Whether DOJ promised to refrain from immediately reopening its "closed" investigation (not whether we should "infer[ ]" something beyond that promise). Once we identify the scope of DOJ's promise, then "under the law of contract [DOJ] was not free to unilaterally change the terms of the settlement agreement by adding an ambiguous sentence to a letter designed to simply confirm that it had upheld its side of the deal." *National Association of Realtors*, 2023 WL 387572, at \*5.

So much for what DOJ's "ambiguous sentence" did *not* do. As for what it *did* do, consider that several of the Realtors' policies were being challenged in court by third parties seeking a class action verdict in excess of a billion dollars.[12] The "ambiguous sentence" is best read to "inform *third parties* that the government had not found one way or the other that the [two remaining policies] were lawful." *Id.* That message — if you want to keep suing the Realtors yourselves, go for it — does not conflict with DOJ's promise not to immediately reopen its own "closed" investigation.

---

[12] *See Burnett v. National Association of Realtors*, 19-cv-0332, ECF 1294 (W.D. Mo. Oct. 31, 2023) (jury verdict awarding class plaintiffs approximately $1.79 billion in damages against all defendants); National Association of Realtors, National Association of Realtors Reaches Agreement to Resolve Nationwide Claims Brought by Home Sellers (Mar. 15, 2024), https://perma.cc/86TR-YBRD (Realtors announcing a $418 million settlement of the class claims against them); *Burnett*, 19-cv-0332, at ECF 1399-1 (W.D. Mo. Mar. 18, 2024) (judgment accepting the settlement).

13

\*   \*   \*

The Antitrust Division of the Department of Justice bargained for a binding contract. That bargain required DOJ to close an investigation, and it did not allow DOJ to immediately reopen the "closed" investigation. In arguing otherwise, DOJ has invited our court to go where no court has gone before — or at least no court identified by DOJ.

For the sake of DOJ's credibility, I wish it had not done so. And for the sake of citizens who find themselves on the other side of the bargaining table, I wish our court had not agreed.[13]

After today, behind the facade of its promise to close an investigation, the government can lure a party into the false comfort of a settlement agreement, take what it can get, and then reopen the investigation seconds later.

So if you ever find yourself negotiating with the Antitrust Division of the Department of Justice, let today's case be a lesson:

**Buyer Beware.**

---

[13] *Cf.* Makan Delrahim, Assistant Attorney General, Antitrust Division of the Department of Justice, Remarks at Bocconi University in Milan (May 25, 2018), https://perma.cc/8EBM-DJFU ("To ensure that businesses can enter contracts, make investments, and plan for the future, we must provide a stable and predictable environment that is free of arbitrary government action and characterized by transparent and fair procedures.").